**UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| Wazee Street Opportunities Fund IV LP, Wazee Street Opportunities Fund V LP, Douglas Whitley, and Lisa Brown, On Behalf of Themselves and All Others Similarly Situated, | Case No.  18-1124C |
| Plaintiffs, | |
| v. | |
| THE UNITED STATES OF AMERICA, | |
| Defendant. | |

**SECOND AMENDED CLASS
ACTION COMPLAINT**

## TABLE OF CONTENTS

NATURE AND SUMMARY OF THE ACTION ................................................................4

JURISDICTION AND VENUE ......................................................................................10

THE PARTIES ..............................................................................................................10

CONSTITUTIONAL PROVISIONS ..............................................................................11

FACTUAL ALLEGATIONS ..........................................................................................11

I. THROUGH 2008, FANNIE MAE AND FREDDIE MAC WERE FINANCED BY PRIVATE INVESTMENT. ...........................................................................11

II. IN JULY 2008, CONGRESS CREATED FHFA, WHICH  IN SEPTEMBER 2008 PLACED THE COMPANIES INTO CONSERVATORSHIP. ....................................13

III. IN EXCHANGE FOR FUNDING, FHFA EXECUTED AN AGREEMENT GIVING TREASURY A 10% SENIOR PREFERRED STOCK DIVIDEND AND WARRANTS TO BUY 79.9% OF EACH COMPANY'S COMMON STOCK FOR A NOMINAL PRICE. ...................................................................................17

IV. AT THE BEGINNING OF 2012, THE HOUSING MARKET REBOUNDED AND THE COMPANIES RETURNED TO PROFITABILITY. ...........................................21

V. ON AUGUST 17, 2012 THE GOVERNMENT IMPOSED THE THIRD AMENDMENT, GIVING TREASURY A RIGHT TO A QUARTERLY DIVIDEND EQUAL TO 100% OF THE COMPANIES' NET WORTH (MINUS A SMALL RESERVE THAT WAS SET TO SHRINK TO ZERO IN 2018)...............................24

VI. IN DECEMBER 2017, TREASURY AND FHFA AGAIN CONFIRMED THAT THE NET WORTH SWEEP MUST ENSURE THAT 100% OF ALL VALUE IN THE COMPANIES MUST GO TO TREASURY, NO MATTER HOW LARGE THAT VALUE MAY BE.................................................................................33

VII. IN 2019, THE GOVERNMENT CONVERTED THE CASH NET WORTH SWEEP INTO A PAYMENT-IN-KIND NET WORTH SWEEP, FURTHERING THE UNJUST ENRICHMENT OF TREASURY AT THE EXPENSE OF PRIVATE SHAREHOLDERS. ..............................................................................34

VIII. THE GOVERNMENT HAS TAKEN PLAINTIFFS' PROPERTY WITHOUT JUST COMPENSATION. ...........................................................................36

IX. THE GOVERNMENT ALSO HAS TAKEN PLAINTIFFS' RIGHT TO BRING CERTAIN CAUSES OF ACTION CHALLENGING THE THIRD AMENDMENT WITHOUT PROVIDING JUST COMPENSATION. ..................................................40

X. THE GOVERNMENT ILLEGALLY EXACTED PLAINTIFFS' PROPERTY. ...........41

i

XI.    THE THIRD AMENDMENT VIOLATED THE CONTRACTUAL RIGHTS OF HOLDERS OF THE FREDDIE MAC COMMON STOCK ........................................... 45

XII.    CLASS ACTION ALLEGATIONS. ................................................................................ 47

PRAYER FOR RELIEF ....................................................................................................................... 67

**CONSOLIDATED CLASS**
**ACTION COMPLAINT**

Plaintiffs Wazee Street Opportunities Fund IV LP ("Wazee Street Fund IV"), Wazee Street Opportunities Fund V LP ("Wazee Street Fund V"), Douglas Whitley, and Lisa Brown (collectively, "Plaintiffs") submit this Class Action Complaint against the United States of America.

## NATURE AND SUMMARY OF THE ACTION

1.      This is a class action brought by Plaintiffs on behalf of themselves and classes (the "Classes," as defined herein) of owners of Common and Preferred Stock issued by the Federal National Mortgage Association ("Fannie Mae" or "Fannie") and the Federal Home Loan Mortgage Corporation ("Freddie Mac" or "Freddie;" Fannie Mae and Freddie Mac together, the "Companies"). Plaintiffs and the Classes (together, the "Plaintiffs") seek just compensation for the taking of their private property, and, alternatively, damages for illegal exaction, breach of contract, breach of the implied covenant of good faith and fair dealing, and breach of fiduciary duty, in connection with the implementation of the Third Amendment to the Senior Preferred Stock Purchase Agreement, dated August 17, 2012 (the "Third Amendment") by the United States of America, including the Department of the Treasury ("Treasury"), the Federal Housing Finance Agency ("FHFA") and agents acting at their direction (collectively, the "Government").

2.      Fannie Mae and Freddie Mac are enterprises chartered by the U.S. Congress to facilitate liquidity and stability in the secondary market for home mortgages. While they have been commonly referred to as "Government Sponsored Enterprises" or "GSEs," Fannie Mae and Freddie Mac are not government agencies. Instead, Congress created the Companies to operate as private, for-profit corporations. As such, the Companies have stockholders, directors, and officers like other non-governmental corporations, and their debt and equity securities have for years been privately owned and publicly traded by institutional and

individual investors, including employees of the Companies, as well as by public pension funds, mutual funds, community banks, and insurance companies, among other institutional investors.

3.     To raise capital, the Companies issued several publicly traded securities, including common stock ("Common Stock") and preferred stock ("Preferred Stock").  By 2008, Fannie Mae and Freddie Mac were two of the largest privately owned financial institutions in the world, and had been consistently profitable for decades.  The Companies marketed their securities aggressively to investors, both large and small, and continued to do so through 2008.

4.     In July 2008, in response to the crisis in the residential housing and mortgage markets, Congress passed the Housing and Economic Recovery Act of 2008 ("HERA"), creating a new federal agency, FHFA, and empowering it to appoint itself as conservator of the Companies under certain circumstances.

5.     On September 6, 2008, FHFA placed Fannie Mae and Freddie Mac into conservatorship.  When FHFA became Conservator, Fannie Mae and Freddie Mac each entered into a Senior Preferred Stock Purchase Agreement ("PSPA") with Treasury.  Under these contracts, Treasury agreed to invest in the Companies in exchange for the issuance of a newly created class of securities in the Companies, known as Senior Preferred Stock. In return for its commitment to purchase Senior Preferred Stock, Treasury received $1 billion of Senior Preferred Stock in each Company as a commitment fee (i.e., that $1 billion did not reflect any investment), as well warrants to acquire 79.9% of the Common Stock of the Companies at a very low, nominal price.  The PSPA also provided that the Treasury would hold a liquidation preference in each Company equal to the $1 billion commitment fee plus the total amount Treasury invested in that respective Company.  In addition, the Senior Preferred Stock ranked senior in priority to all other series of Fannie Mae and Freddie Mac Preferred Stock and Common Stock, and would earn an annual dividend, paid quarterly, equal to 10% of the outstanding liquidation preference,

*i.e.*, 10% of the sum of the $1 billion commitment fee plus the total amount Treasury invested in that Company. If a Company elected not to pay the dividend in cash, Treasury would receive a dividend in the form of additional Senior Preferred Stock with a face value equal to 12% of the liquidation preference.

6. The warrants to acquire a 79.9% ownership stake in the Companies gave Treasury a significant "long" position—over and above the substantial 10% coupon on its Senior Preferred Stock. If exercised, these warrants would allow Treasury to receive enormous profits in the event the Companies returned to profitability and started paying dividends on their common stock. However, any dividends paid on that common stock would have to be paid after paying the required dividends on private held preferred stock. In addition, the FHFA could not pay dividends to the Government on its 79.9% of common stock (assuming it exercised its warrants) without also paying a pro rata dividend to all the private owners of common stock in the two Companies, such as the Plaintiffs.

7. These terms would have been nonsensical if the imposition of the conservatorship had somehow nullified the rights of all private shareholders. Indeed, the structure of the PSPAs between Treasury and FHFA reflected the shared understanding that (a) the Companies continued to be owned by shareholders with certain economic rights, and had not been simply "taken over by the Government," and (b) in addition to Treasury's rights as a shareholder, there were other, private shareholders who continued to have an ownership interest in the Companies, but whose rights were now subordinated to Treasury's rights as a senior preferred shareholder and (in the case of common shareholders) subject to dilution because Treasury held warrants to buy 79.9% of the common stock. That was the enormous price of Treasury's commitment to providing funding to the Companies. But while it was an enormous price, it did not eliminate the rights of private shareholders. Indeed, at the time these PSPAs were executed, FHFA's director told investors that "**the common and all preferred stocks will**

**continue to remain outstanding**."  Statement of FHFA Director James B. Lockhart (Sept. 7, 2008) (*available at* goo.gl/xMjTse).  Likewise, Treasury Secretary Paulson made clear that "**conservatorship does not eliminate the outstanding preferred stock**, but does place preferred shareholders second, after the common shareholders, in absorbing losses."  Statement by Secretary Henry M. Paulson, Jr. (Sept. 7, 2008) (*available at* goo.gl/weFLds).

8.    This lawsuit does not challenge the foregoing arrangement made in September 2008.  While Plaintiffs do not concede that all the measures taken in September 2008 were justified or necessary, they are not here to challenge the placement of Fannie and Freddie into conservatorship at the height of the financial crisis, or the original deal struck by Treasury and FHFA at that time.

9.    But four years later, something very different happened.  Just as the housing market was recovering and the Companies were returning to robust profitability, the Treasury and FHFA agreed to an "amendment" to the PSPAs under which the 10% Senior Preferred Stock dividend was converted into a "Net Worth Sweep" that required the Companies to pay the full amount of their net worth to Treasury every quarter, minus a small reserve that was set to shrink to zero by 2018.  Under this "Net Worth Sweep" (formally called the "Third Amendment" to the PSPAs), it became impossible for any private shareholders ever to receive any dividend or liquidation distribution from the Companies.  Even if the Companies generate trillions of dollars in profits and positive net worth, it all goes to the Treasury, and nothing can ever be distributed to private shareholders—not as a dividend, and not even if the Companies are liquidated.

10.    As of August 16, 2012, the day before the Net Worth Sweep, private shareholders had vested rights to dividends and liquidation proceeds, and those rights had economic value.  Once the Net Worth Sweep was put in place, however, those legal rights were obliterated.  Their economic value was therefore also wiped out.  The only value the common stock has had since the Net Worth Sweep is a value that depends on the Net Worth

Sweep being invalidated by the courts or Congress—or from a court awarding damages or just compensation for the Net Worth Sweep.

      11.    The rights that were expropriated by the Government through the Net Worth Sweep belonged to real people who made real investments into Fannie and Freddie. For years, Fannie and Freddie were able to fulfill their public mission because of investments made by private citizens—often very ordinary citizens who invested their life savings.

      12.    The Government has reaped immense profits from the Third Amendment. In total, as of the date of this action's filing—August 1, 2018—the Companies had paid approximately $280 billion in dividends to Treasury.  Of that amount, approximately $50 billion was paid before the Net Worth Sweep, and approximately $230 billion was paid after the Net Worth Sweep.  The dividends paid to Treasury as of August 1, 2018, amounted to approximately $90 billion more than Treasury's total investment in the Companies. Moreover, as of August 1, 2018, the total amount of dividends paid under the Net Worth Sweep was roughly $125 billion more than Treasury would have received under the 10% dividend provided for in the original PSPAs.  Meanwhile, the principal amount of Treasury's Senior Preferred Stock in the two Companies has not been reduced at all, and still stands at a combined total of approximately $190 billion.  Of course, under the Third Amendment, the true amount of Treasury's liquidation preference is infinite:  no matter how much positive value is generated by the Companies, all of it must go to Treasury.  Thus, it would not be truly accurate to say that Treasury's "liquidation preference" is roughly $190 billion; if the Companies are liquidated and a positive surplus results that is greater than $190 billion, the Third Amendment guarantees that *all* of that positive value must be paid to Treasury.

      13.    While the Net Worth Sweep has thus far allowed Treasury to receive approximately $125 billion more than it would have received under the original Senior Preferred Stock deal, Treasury could have captured most of that windfall amount under the

original deal if it had simply exercised its common stock warrants and authorized dividends on common stock. If Treasury had taken that approach—which was obviously the approach contemplated by the original Senior Preferred Stock Agreement—then Treasury would have received almost all of the

$125 billion in excess value, but not quite all of it. First, for Treasury to have received distributions on its common stock, as contemplated in the original deal, Treasury would have to have permitted the Companies to pay dividends to private preferred shareholders, who have to be paid dividends before a common shareholder can be paid. In addition, Treasury would also have had to have authorized pro rata distributions to private common shareholders (such as Plaintiffs here), who would have owned 20.1% of the common stock after the exercise of Treasury's warrants. Treasury still would have gotten almost all of the $125 billion in excess value. But Treasury wanted absolutely all of it, and did not want private shareholders to receive anything, no matter how profitable the Companies might become. That is what motivated the Net Worth Sweep.

14.     Under the Third Amendment, the Government has expropriated Plaintiffs' vested property rights and transferred their value to the Treasury. That constitutes a taking of private property and the Fifth Amendment requires that the Government pay just compensation to the Plaintiffs and the classes they represent.

15.     In addition, at the time it agreed to the Third Amendment (and at the time of the filing of this action, August 1, 2018), the FHFA was an unconstitutional agency because it was created as a so-called "independent agency" that was subject to the control of a single Director who could not be removed by the President other than "for cause." Such an agency violates the basic separation of powers set forth in the Constitution. Further, at the time FHFA agreed to the Third Amendment, it was controlled by an "Acting Director," named Edward DeMarco. Mr. DeMarco was designated as Acting Director on August 25, 2009. There was no

properly appointed and confirmed Director of the FHFA until the Senate confirmed President

Obama's appointment of Mel Watt to serve as Director.  That confirmation occurred on

December 10, 2013, and Mr. Watt took office on January 6, 2014.  Thus, from August 2009 to

January 2014, the FHFA was controlled by an Acting Director who was never properly

appointed or confirmed to control the FHFA.  To the extent the Third Amendment was agreed to

by an agency that was unconstitutional in its structure or that lacked a constitutionally appointed

Director, or was otherwise taken in violation of federal statutory or constitutional law, it

constitutes an illegal exaction of Plaintiffs' interest in the Companies and the Fifth Amendment

requires the Government to pay.

16.     Further, by imposing the Third Amendment, the Government has nullified,

and thereby breached, the express and implied contractual rights of Freddie shareholders, as

contained in their stock certificates.  Finally, the extraordinary control exercised by FHFA as

conservator over Fannie and Freddie created a fiduciary relationship between FHFA, on the one

hand, and the Plaintiffs on the other; the Net Worth Sweep violated FHFA's fiduciary duties.

Plaintiffs and the classes they represent are entitled to recover damages caused by those

breaches.

## JURISDICTION AND VENUE

17.     This Court has jurisdiction over this action, and venue is proper in this

Court, pursuant to 28 U.S.C. § 1491(a).  The named Plaintiffs have claims under the Tucker Act

that are worth more than $10,000 each, and therefore can only adjudicate those claims in this

Court.

## THE PARTIES

18.     Plaintiff Wazee Street Fund IV is a Delaware limited partnership.   It

owns 5,000 shares of Fannie Mae common stock, and 1,093,858 shares of Fannie Mae

preferred stock.  It also owns 385 shares of Freddie Mac common stock.

19.     Plaintiff Wazee Street Fund V is a Delaware limited partnership.  It owns 615 shares of Fannie Mae common stock, and 1,757,244 shares of Fannie Mae preferred stock.  It also owns 615 shares of Freddie Mac common stock, and 4,675 shares of Freddie Mac preferred stock.  Hereinafter, Wazee Street Fund IV and Wazee Street Fund IV are referred to collectively as "Wazee Plaintiffs."  Wazee Plaintiffs are managed by Wazee Street Capital Management LLC, a Colorado limited liability company.

20.     Plaintiff Douglas Whitley is a resident of North Carolina.  He owns 196 shares of Fannie Mae common stock that he acquired in September 2008.

21.     Plaintiff Lisa Brown is a resident of Pennsylvania and has owned 11.6568 shares of Freddie common stock since at least 2014.

22.     Defendant United States of America includes Treasury, FHFA, and agents acting at their direction.

## CONSTITUTIONAL PROVISIONS

23.     The Fifth Amendment to the United States Constitution provides in pertinent part that no person shall "be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation."

## FACTUAL ALLEGATIONS

## I.    THROUGH 2008, FANNIE MAE AND FREDDIE MAC WERE FINANCED BY PRIVATE INVESTMENT.

24.     Fannie Mae and Freddie Mac are stockholder-owned corporations.  Fannie Mae was established in 1938 to provide the mortgage market with supplemental liquidity, and was converted to a private corporation in 1968.  Freddie Mac was created in 1970 as an alternative to Fannie Mae to make the secondary mortgage market more competitive and efficient.  Both Companies are sometimes referred to as "Government Sponsored Enterprises" (or "GSEs"), which reflects the fact that they are private corporations created by Congress to

increase mortgage market liquidity.  They purchase mortgages originated by private banks and bundle them into mortgage-related securities to be sold to investors.  By creating this secondary mortgage market, the Companies increase liquidity for private banks, which enables them to make additional loans to individuals for home purchases.

25.     Notwithstanding that they were created by federal statute, until September 2008, Fannie Mae and Freddie Mac were financed by private investment.  The Companies actively marketed their securities to a wide variety of investors – including through 2008.  For instance, they had a variety of programs to encourage their midlevel employees to buy Company stock. *See Worker Assets Shrink at Fannie and Freddie,* N.Y. TIMES (Aug. 28, 2008).  In May 2008, Fannie Mae produced a "Capital Raise Roadshow" presentation in which the company touted its "[l]ong-term growth and profitability prospects" and the "[c]ompelling investment opportunities in current environment."  The "rationale" was to "[e]nhance long-term shareholder value" and the presentation noted that the "[m]ix of the offering maintains an appropriate ratio of preferred to common equity in our capital structure……. "

26.     Prior to 2007, Fannie and Freddie were consistently profitable.  In fact, Fannie had not reported a full-year loss since 1985 and Freddie had not reported a full-year loss since becoming owned by private shareholders in 1989.

27.     The Companies' federal regulators also actively promoted investment in the companies – including through 2008.  The Office of Federal Housing Enterprise Oversight (the "OFHEO") continued to assure the marketplace of the Companies' soundness through 2008. On June 9, 2008, OFHEO published a news release stating that it classified Fannie Mae and Freddie Mac as "adequately capitalized as of March 31, 2008."  And, in a March 19, 2008 statement, OFHEO director James Lockhart said "both companies have prudent cushions above the OFHEO-directed capital requirements and have increased their reserves" and "We believe they can play an even more positive role in providing the stability and liquidity the markets need

12

right now."  Lockhart also said that the idea of a bailout is "nonsense in my mind" because "The companies are safe and sound, and they will continue to be safe and sound."  *As Crisis Grew, A Few Options Shrank To One*, N.Y. TIMES (Sept. 7, 2008).

28.    Between 1996 and 2008, private preferred shareholders invested approximately $32.9 billion into Fannie Mae and Freddie Mac, of which $19.1 billion was invested into Fannie Mae and $13.8 billion was invested into Freddie Mac.  During that same time period, Fannie Mae and Freddie Mac paid out a total of $5 billion in dividends on the preferred shares issued in exchange for that $32.9 billion in investment.

29.    During 2007 and 2008, the regulator for the GSEs, OFHEO (the FHFA's predecessor), encouraged the GSEs to raise more capital from private investors to ensure that the GSEs could withstand the increasing instability in the housing market.  As a result, private preferred shareholders invested over $19.7 billion into Fannie Mae and Freddie Mac, of which $11.13 billion was invested into Fannie Mae and $8.6 billion was invested into Freddie Mac.  Thus, of the total $32.9 billion invested by private preferred shareholders into Fannie Mae and Freddie Mac between 1996 and 2008, $19.7 billion was invested during the years 2007 and 2008.  The GSEs paid a total of $1.1 billion in dividends on the preferred shares issued in exchange for the $19.7 billion invested into the GSEs in 2007 and 2008.

## II.    IN JULY 2008, CONGRESS CREATED FHFA, WHICH  IN SEPTEMBER 2008 PLACED THE COMPANIES INTO CONSERVATORSHIP.

30.    In July 2008, in response to the crisis in the housing and mortgage markets, Congress enacted HERA. That Act established FHFA to replace the OFHEO as the Companies' regulator, and granted Treasury temporary authority to assist the Companies through the purchase of securities.

31.    Unlike OFHEO, FHFA was created as a so-called "independent agency." It is headed by a Director who is removable from office by the President only "for cause."  12 U.S.C. § 4512(b)(2).  It is insulated from oversight or supervision from other agencies.  *Id.* at §

4617(a)(7).  And unlike virtually all other so-called "independent agencies" established by Congress, FHFA was subject to the control of only a single individual.

32.    HERA provided a specific list of enumerated circumstances under which FHFA would have the power to place the Companies into conservatorship or receivership.

33.    Key leaders repeatedly reassured the public, including the Companies' private investors, that neither Company was approaching insolvency or operating unsafely. Rather, they explained, the goal of the legislation was to provide confidence to the housing market.  For instance, while HERA was under consideration, both Treasury Secretary Henry Paulson and Federal Reserve Chairman Ben Bernanke testified before the House Financial Services committee that Fannie Mae and Freddie Mac were adequately capitalized.  Similarly, while HERA was under consideration, the Companies' then-regulator, OFHEO, issued a statement that, as of 2008, Fannie Mae and Freddie Mac were "holding capital well in excess of the OFHEO-directed requirement[.]"  Similarly, in support of HERA, Senator Isakson (R-GA) commented that:

> The bill we are doing tomorrow is not a bailout to Freddie Mac and Fannie Mae or the institutions that made bad loans. It is an infusion of confidence the financial markets need.  Fannie and Freddie suffer by perception from the difficulties of our mortgage market.  If anybody would take the time to go look at the default rates, for example, they would look at the loans Fannie Mae holds, and they are at 1.2 percent, well under what is considered a normal, good, healthy balance.  The subprime market's defaults are in the 4 to 6 to 8-point range.  That is causing the problem. That wasn't Fannie Mae paper, and it wasn't securitized by Fannie Mae.  They have $50 billion in capital, when the requirement is to have $15 billion, so they are sound.  But the financial markets, because of the collapse of the mortgage market, have gotten worse.

34.    Nevertheless, despite these prior assurances as to the ample capitalization of the Companies, on September 6, 2008, FHFA placed the Companies into conservatorship.

35.    As the Conservator, FHFA became responsible for "preserv[ing] and conserv[ing] [the Companies'] assets and property" and managing them in a manner that would restore them to a "sound and solvent condition."  12 U.S.C. § 4617(b)(2)(D).  At the time, FHFA

stated that the goal of this action was "to help restore confidence in Fannie Mae and Freddie Mac, enhance their capacity to fulfill their mission, and mitigate the systemic risk that has contributed directly to the instability in the current market."  According to FHFA's press release, the conservatorship was "designed to stabilize a troubled institution with the objective of returning the entities to normal business operations.  FHFA will act as the conservator to operate the Enterprises until they are stabilized." FHFA also issued an identical Fact Sheet for each of the two conservatorships stating that, "[u]pon the [FHFA] Director's determination that the Conservator's plan to restore the Company to a safe and solvent condition has been completed successfully, the Director will issue an order terminating the conservatorship."  This Fact Sheet also stated that "The purpose of appointing the Conservator is to preserve and conserve the Company's assets and property and to put the Company in a sound and solvent condition."

36.    As FHFA noted in an October 2008 presentation, "[c]onservatorship statutes provide broad authority for a conservator to operate the institution until it is stabilized **and then returned to shareholders**."  (FHFA00047705) (emphasis added).

37.    Reporting indicates that FHFA's decision to place the Companies into conservatorship was based primarily on a political judgment, rather than an analysis of the HERA statutory factors.  As the *New York Times* reported, the administration sought "to shrink drastically [Fannie Mae and Freddie Mac's] outsize influence on Wall Street and on Capitol Hill while at the same time counting on them to pull the nation out of its worst housing crisis in decades." *In Rescue To Stabilize Lending, U.S. Takes Over Mortgage Finance Titans*, N.Y. TIMES (Sept. 7, 2008).  And "In the end, [Treasury Secretary] Paulson's decision seems to have been a philosophical one, rather than one forced by imminent crisis.  Of course, for stagecraft purposes, it was played as impending disaster." *Paulson's Itchy Finger, on the Trigger of a Bazooka*, N.Y. TIMES (Sept. 9, 2008).

38.    The conservatorship did not purport to involve the appropriation of any

privately held stock, to amend any of the shareholder Certificates of Designation, or otherwise to modify any contractual rights held by private shareholders such as Plaintiffs.

39.     HERA contained a provision allowing the Conservator to repudiate any contracts of the GSEs, and then allowing those contractual counterparties to file a suit seeking damages (but excluding punitive damages), so long as the repudiation was done within a reasonable period of time following the imposition of the conservatorship.  The Conservator did not exercise this power to repudiate the contracts the GSEs had with private shareholders.  All of Freddie Mac's shareholders, both common and preferred, had contracts with Freddie Mac governing their shareholders.  The same is true for the Fannie Mae preferred shareholders.

40.     FHFA's director told investors that "**the common and all preferred stocks will continue to remain outstanding**."  Statement of FHFA Director James B. Lockhart (Sept. 7, 2008) (*available at* goo.gl/xMjTse).

41.     Treasury Secretary Paulson likewise made clear that, "**conservatorship does not eliminate the outstanding preferred stock**, but does place preferred shareholders second, after the common shareholders, in absorbing losses."  Statement by Secretary Henry M. Paulson, Jr. (Sept. 7, 2008) (*available at* goo.gl/weFLds).

42.     In a Form 8-K filing issued by Freddie Mac on September 11, 2008, Freddie Mac stated that, "The holders of Freddie Mac's existing common stock and preferred stock . . . **will retain all their rights** in the financial worth of those instruments, as such worth is determined by the market." (emphasis added).

43.     In Fannie Mae's September 11, 2008 Form 8-K, it stated that "FHFA, as Conservator, has the power to repudiate contracts entered into by Fannie Mae prior to the appointment of FHFA as Conservator if FHFA determines, in its sole discretion, that performance of the contract is burdensome and that repudiation of the contract promotes the

16

orderly administration of Fannie Mae's affairs.  FHFA's right to repudiate any contract must be exercised within a reasonable period of time after its appointment as Conservator."  This statement reflected what is expressly set forth in HERA regarding FHFA's power to repudiate contracts.  Thus, if FHFA was to repudiate the contracts between the Companies and their shareholders, FHFA was required to do so "within a reasonable period of time after its appointment as conservator" on September 6, 2008. By regulation, FHFA determined that "a reasonable period shall be defined as a period of 18 months following the appointment of a conservator." 12 C.F.R. § 1237.5.

44.     FHFA did not, either within a reasonable period of time after its appointment as Conservator or at any other time before August 17, 2012, purport to repudiate any of the contracts governing the Companies' Preferred Stock or any of its other shareholder relationships.

45.     At the time the conservatorship was imposed on September 6, 2008, FHFA stated that it was critical to complete key regulations implementing HERA governing minimum capital standards, prudential safety and soundness standards and portfolio limits "so that any new investor will understand the investment proposition," clearly showing that FHFA intended that private investors would continue to purchase Fannie Mae and Freddie Mac securities.

## III.   IN EXCHANGE FOR FUNDING, FHFA EXECUTED AN AGREEMENT GIVING TREASURY A 10% SENIOR PREFERRED STOCK DIVIDEND AND WARRANTS TO BUY 79.9% OF EACH COMPANY'S COMMON STOCK FOR A NOMINAL PRICE.

46.     When the Companies were placed into conservatorship, Treasury entered into PSPAs with FHFA, which acted on behalf of both Companies.  The PSPAs for Fannie Mae and Freddie Mac are identical in all material respects.  Through these agreements, Treasury agreed to make investments in the Companies in exchange for Senior Preferred Stock plus warrants to acquire common stock equal to 79.9% of the common stock in the Companies.

Under the instruments laying out the terms of the Senior Preferred Stock for each Company:

(a)  Treasury was given the right to receive a senior preferred dividend each quarter in an amount equal (on an annual basis) to 10% of the outstanding principal value of the Senior Preferred Stock if the dividend was paid in cash;

(b)  If a Company elected not to pay the dividend in cash, Treasury would receive a dividend in the form of additional Senior Preferred Stock with a face value equal to 12% of the outstanding principal value of the Senior Preferred Stock;

(c)  The principal value of the Senior Preferred Stock in each Company would equal the amount invested by Treasury in each Company, plus $1 billion to reflect a commitment fee with respect to each Company (plus any stock dividends distributed based upon the 12% dividend right referenced above);

(d)  The Senior Preferred Stock ranked senior in priority to all other Fannie Mae and Freddie Mac Stock, so that no dividends or liquidation distributions could be paid to any other owner of stock in the Companies until after Treasury had received its dividend or liquidation distributions under its Senior Preferred Stock (the liquidation preference was equal to the principal value of the Senior Preferred Stock plus any unpaid dividends);

(e)  Treasury also received warrants to acquire 79.9% of the common stock of each Company for a nominal price; and

(f)  Treasury was also given the right to receive a quarterly periodic commitment fee, to be set for five-year periods by agreement of the

Companies and Treasury, but Treasury had the option to waive the fee for up to a year at a time.[1]

47.   The foregoing terms, particularly those referring to priority over the rights of other (private) shareholders, would have been nonsensical if the rights of other shareholders had been nullified by the conservatorship.  The PSPAs clearly contemplate that private shareholders retained their rights to dividends and liquidation distributions, albeit subject to the preferences given to the Treasury under the PSPAs.

48.   This can also be seen by looking at Treasury's statutory authority to purchase stock in the Companies, and statements made by the Treasury Secretary in connection with those purchases.  In general, Treasury does not have the statutory authority to purchase corporate stock.  However, HERA gave Treasury temporary authority to purchase securities issued by the Companies.  *See* 12 U.S.C. §§ 1455(*l*), 1719(g). To exercise that authority, the Secretary of the Treasury was required to determine that purchasing the Companies' securities was "necessary to . . . provide stability to the financial markets; . . . prevent disruptions in the availability of mortgage finance; and . . . protect the taxpayer." 12 U.S.C. §§ 1455(*l*)(1)(B), 1719(g)(1)(B). In making those determinations, the Secretary was required to consider six factors:

> (i) The need for preferences or priorities regarding payments to the Government.
>
> (ii) Limits on maturity or disposition of obligations or securities to be purchased.
>
> (iii) *The [Companies'] plan[s] for the orderly resumption of private*

---

[1] The specific contractual language governing language for the periodic commitment fee provided that: "The amount of the Periodic Commitment Fee shall be set not later than December 31, 2009 with respect to the ensuing five-year period, shall be reset every five years thereafter and shall be determined with reference to the market value of the Commitment as then in effect. The amount of the Periodic Commitment Fee shall be mutually agreed by Purchaser and Seller, subject to their reasonable discretion and in consultation with the Chairman of the Federal Reserve; provided, that Purchaser may waive the Periodic Commitment Fee for up to one year at a time, in its sole discretion, based on adverse conditions in the United States mortgage market."

*market funding or capital market access.*

(iv) The probability of the [Companies] fulfilling the terms of any such obligation or other security, including repayment.

(v) *The need to maintain the [Companies'] status as . . . private shareholder-owned compan[ies].*

(vi) Restrictions on the use of [the Companies'] resources, including limitations on the payment of dividends and executive compensation and any such other terms and conditions as appropriate for those purposes.

*Id.* §§ 1455(*l*)(1)(C), 1719(g)(1)(C) (emphasis added).

49.     In approving the exercise of Treasury's temporary authority under HERA to purchase securities of the Companies, Treasury Secretary Paulson determined (1) "[u]nder conservatorship, Fannie Mae and Freddie Mac will continue to operate as going concerns"; (2) "Fannie Mae and Freddie Mac may emerge from conservatorship to resume independent operations"; and (3) "[c]onservatorship **preserves the status and claims of the preferred and common shareholders**." Action Memorandum for Secretary Paulson (Sept. 7, 2008) (emphasis added).  None of this would have made any sense if the conservatorship and original PSPAs were intended to nullify the rights of the Companies' private shareholders.

50.     After FHFA took control of the Companies, it claimed that it did not expect them to be profitable, and that they would likely incur large losses in the coming years. FHFA therefore directed the Companies to book substantial loss reserves—recording anticipated mortgage loan losses before they were actually incurred—and required the Companies to eliminate from their balance sheets the value of deferred tax assets that would only be of use if the Companies became profitable (*i.e.*, generated positive taxable income).

51.     As the Government was well aware in 2008, these write-downs and accounting decisions led to the payment of some circular dividend payments.  To pay a quarterly dividend payment to Treasury, the FHFA caused the Companies to draw on Treasury's funding commitment.  This, in turn, increased the amount of stock held by Treasury, which further

increased the amount of dividends the Companies were required to pay.

52.     Treasury's authority under HERA to purchase the Companies' securities expired on December 31, 2009. *See* 12 U.S.C. §§ 1455(*l*)(4), 1719(g)(4). After that date, HERA authorized Treasury only "to hold, exercise any rights received in connection with, or sell" previously purchased securities. *Id.* §§ 1455(*l*)(2)(D), 1719(g)(2)(D).

53.     During 2009, Treasury and FHFA amended the PSPAs twice. First, in May 2009, Treasury agreed to expand its funding commitment to $200 billion per Company from $100 billion per Company. Then, on December 24, 2009, it agreed to a funding commitment that would be sufficient to allow the Companies to satisfy their 2010, 2011, and 2012 capitalization requirements and a funding commitment up to a limit determined by an agreed-upon formula for subsequent years.

54.     Throughout this time, the Companies continued to be managed in conservatorship by FHFA. HERA empowered FHFA to force the Companies into receivership and to liquidate their assets under certain circumstances, 12 U.S.C. § 4617(b)(2)(E), but FHFA always has maintained that its relationship with the Companies is that of Conservator rather than liquidator. *See* News Release FHFA, *A Strategic Plan For Enterprise Conservatorships: The Next Chapter In A Story That Needs An Ending*, at 9 (Feb. 21, 2012) (asserting that "[w]ithout action by Congress, FHFA must continue to look to the existing statutory provisions that guide the conservatorships"). FHFA has never stated that it was placing the Companies into receivership.

## IV.   AT THE BEGINNING OF 2012, THE HOUSING MARKET REBOUNDED AND THE COMPANIES RETURNED TO PROFITABILITY.

55.     By the beginning of 2012, it became clear that the Government had (perhaps deliberately) overestimated the Companies' likely losses and underestimated the possibility of a return to profitability. Contrary to FHFA's 2008 projections, the Companies posted profits of more than $10 billion for the first two quarters of 2012. Even more

importantly, the Companies disclosed that they expected to be consistently profitable for the foreseeable future, and that expectation of profitability meant that they would soon be able to reverse the valuation allowance against their deferred tax assets, worth approximately $100 billion.  In addition, the Companies' actual loan losses were far less than anticipated.  Between the beginning of 2007 and the second quarter of 2012, more than $234 billion had been set aside by the Companies to absorb anticipated loan losses, whereas loan losses of just over $125 billion were actually recognized during that period, such that the projected losses had been overestimated by $109 billion.  The reversal of these excess reserves would lead to a substantial increase in profitability.

56.     By the beginning of 2012, the Companies, FHFA, and Treasury were very well aware that Fannie Mae and Freddie Mac were expected to be sufficiently profitable for years to come to pay the 10% dividend on the Senior Preferred Stock without having to draw money from the Treasury.

57.     In fact, as early as November 8, 2011, the accounting and consulting firm Grant Thornton LLP prepared a report for Treasury acknowledging that "[f]rom December 31, 2012 through September 30, 2018, Freddie Mac is not projected to draw on the liquidity commitment to make its dividend payments because of increased earnings driven by significantly reduced credit losses in 2012 and 2014."  (GT007342.)  A December 2011 internal Treasury memorandum acknowledged that "both Fannie Mae and Freddie Mac are expected to be net income positive (before dividends) on a stable, ongoing basis after 2012 . . . ."  (UST00473633.)

58.     In June 2012, Treasury was aware that "the GSEs will be generating large revenues over the coming years, thereby enabling them to pay the 10% annual dividend well into the future even with the caps."  (UST00533645.)  Similarly, an August 1, 2012 Treasury presentation acknowledged that in mid-2012, earnings for the Companies would be "in excess of

current 10% dividend paid to Treasury." (UST00385572).

59.    By the end of 2011 and the beginning of 2012, the Companies, FHFA, and Treasury were aware that, beginning in 2012, the Companies were forecast to be so consistently profitable that the Companies could afford to repay Treasury its initial investment within eight years.  In her 2015 deposition, Susan McFarland, Fannie Mae's then-Chief Financial Officer, testified that at a meeting with Treasury that was also "probably" attended by FHFA, shortly before learning of the Third Amendment, she had expressed her view that Fannie Mae was "**able to deliver sustainable profits over time**."  (McFarland Tr., 45:2-4, 46) (emphasis added).

60.    According to July 13, 2012 documents circulated among FHFA officials regarding a Fannie Mae Executive Management Meeting held on July 9, 2012, the following eight years were likely to be the "**golden years of GSE earnings**."  (FHFA00047889) (emphasis added).  In the same documents, Fannie Mae official Ann Gehrig noted that "[c]umulative 2012 – 2016 income is now forecast at $56.6 billion, $12.3 billion higher than the last projection." (FHFA00047890.)  The Fannie Mae Executive Management Meeting documents also included a report from Fannie Mae Treasurer Dave Benson acknowledging that "[c]urrent projections show that cumulative GSE dividends paid will surpass cumulative GSE Treasury draws by 2020." (FHFA00047889.)  The report by David Benson, dated July 19, 2012 and distributed to the Fannie Mae board of directors, included projections demonstrating that "[th]e cumulative dividends from both GSEs exceed government investment by 2020 in baseline scenario" as well as forecasts of positive annual Total Comprehensive Income from 2012 through 2022. (FM_Fairholme_CFC-00000220-221, 231-232.)

61.    In addition, as FHFA and Treasury were aware, the Companies had certain deferred tax credits that would further enhance their profitability in the very near term.  In a May 29, 2012 meeting between Treasury and various financial advisors, there was a discussion of "[r]eturning the deferred tax asset to the GSE balance sheets." (UST00405880.)  A series of

August 14, 2012 emails between FHFA officials acknowledged that "re-recording certain deferred tax assets" had been discussed "on the view that" the Companies "were going to be profitable going forward." (FHFA00038592.) In her 2015 deposition, McFarland testified that shortly before learning of the Third Amendment, she had expressed her view at a meeting with Treasury that approximately $50 billion of deferred tax assets might soon be released. (McFarland Tr., 45:8; 59:18.)

62.     Thus, as of the first half of 2012, FHFA, Treasury, and the Companies all knew that the Companies were positioned to pay back the Government for the support they had received, with money left over to provide a financial return to their other stockholders.

**V.   ON AUGUST 17, 2012 THE GOVERNMENT IMPOSED THE THIRD AMENDMENT, GIVING TREASURY A RIGHT TO A QUARTERLY DIVIDEND EQUAL TO 100% OF THE COMPANIES' NET WORTH (MINUS A SMALL RESERVE THAT WAS SET TO SHRINK TO ZERO IN 2018).**

63.     With the Companies' return to consistent, and indeed record profitability, the private stockholders had reason to believe and expect that the Companies would soon become healthy enough to redeem the Senior Preferred Stock, exit conservatorship, and be "return[ed] to normal business operations," as FHFA's director had vowed when the conservatorship was established. Certainly, the holders of the Common Stock had reason to believe and expect that the economic value of their shares, and the rights they had as stockholders, would likely be increasing. They had no reason to believe those rights would be taken by the Government without just compensation. Nor did they have any reason to expect that the Treasury would re-do its arrangement in a manner that would result in it receiving a massive windfall over and above the generous compensation terms set forth in the original September 2008 PSPAs.

64.     But, rather than taking steps to enable the Companies to redeem the Senior Preferred Stock or at least to accumulate capital for the benefit of the Companies and their private shareholders, the Government took the unprecedented step of radically changing the deal

FHFA and Treasury had originally made so as to seize 100% of all value the Companies could ever generate, and to eliminate any possibility that private shareholders would ever receive anything.  On August 17, 2012, FHFA, purportedly acting as Conservator for the Companies, and the Treasury "agreed to" a so-called "Third Amendment" to the PSPAs.  This Third Amendment was not really an "agreement" between two different entities negotiating at arm's length, but was instead a unilateral action by two government entities acting in concert.  It provides that in place of the 10% coupon due on Treasury's Senior Preferred Stock under the original PSPAs, the Treasury would now receive a dividend equal to ***100% of the Companies' net worth*** (minus a small reserve that was set to shrink to zero in 2018)  And, since the PSPAs provided that in the event of a liquidation of Fannie Mae or Freddie Mac, the Government would receive a liquidation distribution that included an additional Net Worth Sweep dividend, the Third Amendment guaranteed that even if the Companies were liquidated, Treasury would receive ***100% of their net worth*** in that liquidation.  No matter how much value the Companies generate, the Third Amendment provides that 100% of it has to go to the Treasury.

65.    Thus, the Third Amendment expropriated for the Government all of the economic rights held by the private shareholders of Fannie and Freddie.  As Treasury stated on the day of the announcement, the Third Amendment was intended to ensure that "every dollar of earnings that Fannie Mae and Freddie Mac generate will benefit taxpayers" – *i.e.,* not the private stockholders.

66.    Neither the Companies nor the stockholders received any meaningful consideration in exchange for the Third Amendment.  Under the Third Amendment, the amount of cash the Companies transfer to Treasury as a dividend does not reduce the amount of the Senior Preferred Stock outstanding.  Furthermore, the Companies have not been permitted to redeem Treasury's Senior Preferred Stock.  Thus, regardless of how much money the Companies send to Treasury, all of the Senior Preferred Stock will remain outstanding, and

Treasury will continue to take all of the Companies' net worth. The Third Amendment thus takes tens of billions of dollars of value (if not hundreds of billions) from the Companies' private shareholders and transfers that value to the federal government.

67.     The Government implemented the Third Amendment to promote the economic and political interests of one stockholder—the U.S. Treasury—at the expense of all others. The Net Worth Sweep furthered the Government's goal of ensuring that all future profits be transferred to Treasury (sometimes referred to as "taxpayers"), and not to the private stockholders. It also appears that the Third Amendment was designed to support the Treasury's political goal, at least as of 2012, of winding down the Companies (and winding them down in a way that captured 100% of the surplus value for the Treasury). For instance, in a draft Question and Answer presentation circulated among Treasury officials on August 13, 2012, Treasury stated that the Third Amendment was "consistent with Treasury's policy to wind-down the GSEs," and specifically intended to "ensure that the GSEs will not be able to rebuild capital as they are wound down." (UST00406551; UST00406544.)

68.     On August 15, 2012, Treasury officials circulated emails regarding an update to the "PSPA Q&As" in which the sought-after demise of the Companies was discussed. "By taking all of their profits going forward, we are making clear that the GSEs will *not* ever be allowed to return to profitable entities at the center of our housing finance system." (UST00554584; UST00505919) (emphasis in originals).

69.     The Government's determination to expropriate private stockholder rights dates back to before 2012, although this was not publicly known. For example, jurisdictional discovery in this case has revealed that as early as December 20, 2010, then Under Secretary for Domestic Finance Jeffrey A. Goldstein authored an "ACTION MEMORANDUM" for Secretary Geithner that referred to "the Administration's commitment to ensure existing common equity holders will not have access to any positive earnings from the GSEs in the future." *See* 13-cv-

1053 (D.D.C.) ECF No. 23-5 at TREASURY-0202.

70.     Similarly, jurisdictional discovery in this case has shown that at least as early as January 2012, FHFA had also determined to "wind down" the Companies, a "goal" FHFA explicitly shared in "common" with Treasury.  For example, a document produced in discovery shows that on January 4, 2012 Mary Miller (of Treasury) sent then-FHFA Director DeMarco an Agenda noting the "common goals" shared by FHFA and Treasury to "promote a strong housing market recovery, reduce government involvement in the housing market over time and to provide the public and financial markets *with a clear plan to wind down the GSEs*" (FHFA00025816) (emphasis added).  Subsection 2 of the Agenda was titled "Establish meaningful policies that demonstrate a commitment to winding down the GSEs." *Id.*

71.     On July 31, 2012, the FHFA emailed Treasury the expected second quarter financial results of the GSEs, showing that (a) Fannie Mae was going to report net income of $5.1 billion, which after payment of the senior preferred dividend to Treasury would increase Fannie Mae's net worth to $2.8 billion, and (b) Freddie Mac was going to report net income of $3.0 billion, which after payment of the senior preferred dividend to Treasury would increase Freddie Mac's net worth to $1.1 billion.  This email was shared internally with others at Treasury, including Timothy Bowler, who was Treasury's point person in its discussions with FHFA over possible amendments to the PSPA.  Mr. Bowler responded to these financial results by writing:  "Really makes sense to push the net worth sweep this quarter." (TREASDDC00044338).

72.     Discovery has also revealed August 14, 2012 emails between FHFA officials under the subject line "SPSPA Meeting," which acknowledged that the Third Amendment was "designed to demonstrate wind down," notwithstanding that the Companies "were going to be profitable going forward."  (FHFA00038592.)  On August 17, 2012, FHFA official Mario Ugoletti emailed colleagues, noting that the Third Amendment "does not allow the

[Companies] to build up retained surplus, which may give the impression that they are healthy institutions." (FHFA00031721.)

73.     At a dividend rate of 10%, Treasury's approximately $189 billion in outstanding Senior Preferred Stock (as of August 16, 2012) would have yielded annual dividends of some $18.9 billion, payable in quarterly installments of approximately $4.7 billion.  Thus, ***but for the Third Amendment,*** in any quarter in which the Companies' combined profits exceeded $4.7 billion (or more precisely, any quarter in which Fannie Mae or Freddie Mac's profits exceed the dividend owed on their Senior Preferred Stock), that excess value would inure to the benefit of the private stockholders.  As *Fortune* magazine reported:

> Why did the Treasury enact the so-called Third Amendment that so radically altered the preferred-stock agreement? By mid-2012, Fannie and Freddie were beginning to generate what would become gigantic earnings as the housing market rebounded.  If the original agreement remained in place, the GSEs would build far more than $100 billion in retained earnings, and hence fresh capital, in 2013 alone.  That would exert pressure for Congress to allow Fannie and Freddie to pay back the government in full, and reemerge as private players. Timothy Geithner was strongly opposed to the rebirth of the old Fannie and Freddie.  The "sweep clause" that grabbed the entire windfall in profits was specifically designed to ensure that Fannie and Freddie remained wards of the state that would eventually be liquidated.

*What's Behind Perry Capital's Fannie and Freddie Gambit*, Fortune (July 8, 2013).

74.     In an August 17, 2012 press release announcing the Third Amendment, Treasury said that the changes would "help expedite the wind down of Fannie Mae and Freddie Mac, make sure that every dollar of earnings each firm generates is used to benefit taxpayers, and support the continued flow of mortgage credit during a responsible transition to a reformed housing finance market."  It called the Third Amendment a full sweep of "**every dollar of profit that [the] firm earns going forward**," and that the amendment will fulfill the "commitment made in the Administration's 2011 White Paper that [Fannie Mae and Freddie Mac] will be wound down and will not be allowed to retain profits, rebuild capital, and return to the market in their prior form."

28

75.     This language was in stark contrast to the earlier public representations by Treasury and FHFA that they sought only to "stabilize" the Companies, to "preserve and conserve" their assets, and return them "to normal business operations" (as well as DeMarco's February 2, 2010 statement that "[t]here are a variety of options available for post-conservatorship outcomes, but the only one that FHFA may implement today under existing laws is to reconstitute the two companies under their current charters.")

76.     Winding down the Companies via the Net Worth Sweep offered much higher returns to Treasury than the pre-amendment 10% dividend, an opportunity not lost on Treasury.  A "KEY POINTS TO MAKE" document made clear that the Net Worth Sweep "means the taxpayer will benefit from all future earnings of the GSEs.  Under the current framework we are limited to the 10% dividend." (UST00061421) (emphasis in original).  The document describes taxpayers as being in a "better position" because they are not "capped at the 10% dividend."  (UST00061422.)  Similarly, an August 13, 2012 email to Bowler (of Treasury) confirmed that "**[t]he taxpayer will thus ultimately collect more money with the changes**" and "**not just the 10% dividend**."  (UST00061143.)

77.     Thus, there can be no doubt about the intention behind the Third Amendment and its Net Worth Sweep:  it was intended to give Treasury "more money" by ensuring that *all* the profits of the Companies would be swept to Treasury, "not just the 10% dividend."  Regardless of whether the Companies are actually wound down or not, that is both the clear effect of the Net Worth Sweep and its stated intent.  It takes the economic rights held by private shareholders and transfers 100% of them to the Treasury.

78.     After the Net Worth Sweep was finalized, a senior White House advisor involved in the process wrote that Treasury was "ensuring that [the Companies] can't recapitalize" and "clos[ing] off [the] possibility that [Fannie and Freddie] ever[] go (pretend) private again."  The same official wrote in another email that the Net Worth Sweep would

ensure that the Companies "can't repay their debt and escape."

79.     Similarly, an internal email between the Treasury officials involved in the Net Worth Sweep and Mr. Jim Parrott, the White House economic advisor in charge of housing finance, quotes a Bloomberg article in which Mr. Peter Wallison of the American Enterprise Institute is quoted as follows: "The most significant issue here is whether Fannie and Freddie will come back to life because their profits will enable them to re-capitalize themselves and then it will look as though it is feasible for them to return as private companies backed by the government," Wallison said in a telephone interview. "What the Treasury Department seems to be doing here, and I think it's a really good idea, is to deprive them of all their capital so that doesn't happen." (TREASDDC00056921). Within 30 minutes of seeing the email with this quote from Mr. Wallison, Mr. Parrott emailed Mr. Wallison as follows: "Good comment in Bloomberg – you are exactly right on substance and intent." (UST00503986).

80.     The Government has received and will continue to receive a massive windfall pursuant to the terms of the Third Amendment. In 2013, the first year in which the Net Worth Sweep took effect, the Companies paid dividends to Treasury of over $130 billion. That was $111 billion more than the dividends they would have paid Treasury under the original 10% senior preferred dividend. Between September 2008 and the middle of 2019, the Companies paid over $330 billion in cash dividends to Treasury. Of that amount, approximately $55 billion was paid before the Net Worth Sweep, and approximately $245 billion was paid after the Net Worth Sweep. This was approximately $123 billion more than the amount the Companies would have paid to Treasury under the original 10% senior preferred dividend.

81.     The Third Amendment has even captured the Companies' recoveries on legal claims that preceded the conservatorships. For example, on October 1, 2013, Freddie Mac announced that it had entered into a $1.3 billion settlement with three financial institutions concerning Freddie Mac's claims relating to representations and warranties on loans that it had

purchased.  FHFA, as Freddie Mac's Conservator, had approved the settlement.  The claims at issue involved loans that Freddie Mac purchased between 2000 and 2012, most of which preceded the conservatorship by several years, yet none of the funds recouped will go to benefit Freddie Mac stockholders.  Rather, Freddie Mac's CEO stated that, "[w]ith these settlements, Freddie Mac is recouping funds effectively due to the nation's taxpayers."  On May 28, 2013, FHFA announced a $3.5 billion settlement of claims of alleged violations of federal and state securities laws in connection with private-label residential mortgage-backed securities purchased by Fannie Mae and Freddie Mac in the years prior to the conservatorships.  Similarly, on October 25, 2013, FHFA announced a $1.1 billion settlement with JP Morgan relating to claims based on loans sold to Fannie and Freddie in the years leading up to the financial crisis and a separate $4 billion settlement with JP Morgan relating to claims for violations of federal securities laws in connection with the sales and securitizations of loans to the Companies from 2005 to 2007.  In 2013 alone FHFA announced similar settlements with General Electric ($549 million), UBS ($885 million), Wells Fargo ($335 million), and Bank of America ($404 million), every penny of which went to Treasury.  In 2014, FHFA announced settlements, in its role as Conservator to the Companies, totaling approximately $9.7 billion with Bank of America ($9.33 billion aggregate payment), Barclays Bank PLC ($280 million) and RBS Securities ($99.5 million) which cover private-label MBS purchased by the Companies from 2005 to 2007.  More recently, in 2017, FHFA reached a $5.5 billion settlement with the Royal Bank of Scotland.  The entirety of the Companies' recoveries in these settlements has been paid to Treasury, even though the claims belonged to the Companies for wrongdoing and harm suffered before the conservatorship.

82.     In public statements and filings in this and other related cases, the Government has claimed that the Third Amendment was implemented for the purpose of ending the "circularity" or "downward spiral" caused by the Companies' drawing on Treasury funding to pay dividends to Treasury, which in turn increased Treasury's stake.  The Government's

liability for taking private property does not depend on its motive.  Nevertheless, the Government's claimed motive is false.  When it implemented the Third Amendment, the Government knew the Companies had returned to profitability and were projected to be able to pay the dividends owed to the Treasury without drawing on additional funds long into the future.  Indeed, the Government imposed the Net Worth Sweep after the Companies disclosed that they had returned to stable profitability and had earned several billion dollars more than was necessary to pay the Treasury dividend in cash.  Further, any conceivable problem of being unable to pay the 10% dividend could have been addressed through the payment-in-kind provisions set forth in the PSPA certificates.  The real motive behind the Third Amendment was the U.S. Government's desire to appropriate all of the economic rights from the Companies' private shareholders, to prevent those shareholders from receiving any money, to maximize the amount of money flowing into the U.S. Treasury, and to ensure that the Companies be wound down and ultimately eliminated (or at least not permitted to return to full private ownership).  Again, whether the Government chooses to wind down the Companies or not is a separate question from whether the Government is permitted to appropriate all of the shareholder rights held by private shareholders, and to transfer those rights to the Treasury, without payment of any compensation.  There is nothing that permits the Government to do that – at least not without paying just compensation or appropriate damages to the private shareholders.

83.     In sum, since the implementation of the Third Amendment, the Government has expropriated "every dollar of earnings that each firm earns" on a quarterly basis, and will continue to do so forever (whether the Companies are wound down or not).  This guarantees that there can never be a distribution to the holders of Common Stock, either as a dividend or in liquidation or in any other form, no matter how much income the Companies earn and no matter how much their assets are worth.  The Third Amendment is clear:  private shareholders cannot ever receive a dime; all of the economic shareholder rights previously

owned by those shareholders are now held by Treasury, which gets absolutely all of the positive

value generated by the Companies, no matter how many hundreds of billions in profit that means

Treasury receives over and above what it has invested and what it would have received under the

original PSPAs.

## VI.   IN DECEMBER 2017, TREASURY AND FHFA AGAIN CONFIRMED THAT THE NET WORTH SWEEP MUST ENSURE THAT 100% OF ALL VALUE IN THE COMPANIES MUST GO TO TREASURY, NO MATTER HOW LARGE THAT VALUE MAY BE.

84.    As originally formulated in the Third Amendment, the Net Worth Sweep

required the entire net worth of the Companies to be paid to Treasury, minus a small reserve

that would shrink gradually to zero by January 1, 2018.  The intent was obvious:  the

Companies were to be wound down, and Treasury was to capture 100% of all the value.

85.    By December 2017, however, Treasury and FHFA apparently concluded

they were not ready to liquidate the Companies just yet, or to operate them with literally zero

capital.  Accordingly, in December 2017, Treasury and FHFA agreed to prolong the existence

of a $3 billion capital reserve while the Companies were in operation, so that the quarterly

dividend is equal to the "Net Worth Amount" minus that $3 billion reserve.  Letter to M. Watt

(Dec. 21, 2017) (*available at* goo.gl/hnPmKL).

86.    However, Treasury and FHFA also made sure that this capital reserve did

not create any possible risk of any amount ever being available for distribution to private

shareholders.  For each of the two Companies, they expressly agreed that "the Liquidation

Preference [i.e., the Liquidation Preference held by Treasury] shall be increased by

$3,000,000,000.00."  *Id.*  Thus, even the capital reserve has to be paid out to Treasury.  No

matter what happens—no matter how much money or positive net value Fannie and Freddie

make—there is ***zero chance*** that private shareholders can ever receive anything in a

liquidation.

**VII.    IN 2019, THE GOVERNMENT CONVERTED THE CASH NET WORTH SWEEP INTO A PAYMENT-IN-KIND NET WORTH SWEEP, FURTHERING THE UNJUST ENRICHMENT OF TREASURY AT THE EXPENSE OF PRIVATE SHAREHOLDERS.**

87.     In 2019, the Treasury and FHFA entered into letter agreements that provided for the Companies to start building their net worth, while also providing that 100% of that net worth would be owned solely by Treasury.   Specifically, these letter agreements stated that beginning in the third quarter of 2019, the Companies would no longer sweep their net worth to the Treasury in cash form, but instead would start to build capital by the amount of any net worth they generated; at the same time, however, the letter agreements provided that the Liquidation Preference in Treasury's senior preferred stock in each Company would increase by the amount of any net worth generated in each quarter—in other words, the Net Worth Sweep would be transferred "in kind" in the form of increased Liquidation Preference, rather than in the form of cash.  Thus, while these letter agreements finally allowed the Companies to start building capital, they also ensured that Treasury – and Treasury alone – would own 100% of that capital through its senior preferred stock.

88.     The 2019 letter agreements provided for the foregoing regime to last until each Company had generated a specified amount of capital – $25 billion in the case of Fannie Mae, and $20 billion in the case of Freddie Mac.

89.     In 2021, Treasury and FHFA entered into another round of letter agreements that provided for the continuation of the "in kind" payment of the Net Worth Sweep.  These agreements provided that the Treasury's Liquidation Preference would continue to be increased each quarter by the amount of net worth each Company generated that quarter until the quarter in which the Company achieved the newly published regulatory capital requirements promulgated by the FHFA.

90.     The combined effect of the 2017, 2019, and 2021 amendments has been to increase Treasury's Liquidation Preference in the two Companies by over $85 billion.  That Liquidation Preference continues to be increased each quarter as the Companies continue to generate positive earnings that builds their net worth.

91.     The combination of the foregoing "in kind" transfers of net worth to Treasury and the cash dividends paid to Treasury adds up to a total of over $385 billion in wealth transferred by the Companies to the Treasury.

92.     That $385 billion is approximately $150 billion more than the most that would have been transferred to Treasury under the 10% senior preferred dividend from the original deal.

93.     The $385 billion of wealth transferred to the Treasury also vastly exceeds the approximately $190 billion of capital invested by Treasury into the Companies.  (The $190 billion investment is reflected in an additional $190 billion in Liquidation Preference, wholly apart from the $85 billion in Liquidation Preference accumulated thus far as in-kind net worth sweeps to Treasury.)

94.     Thus, Treasury has received far more in wealth transfers than it could possibly have received under the original terms of the PSPAs.  The original PSPAs provided for Treasury to receive (a) a senior preferred dividend equal on an annual basis to 10% of the amount invested plus the initial commitment fee of $1 billion per Company, (b) warrants to acquire 79.9% of the common stock of each Company, and (c) a periodic commitment fee that would be set based upon an the "market value" of the Commitment as "mutually agreed" by FHFA and Treasury, "subject to their reasonable discretion and in consultation with the Chairman of the Federal Reserve," and which could also be waived (as it always has been).  There is no possible way these provisions could have transferred 100% of the net worth of the Companies to Treasury, and therefore there is no possible way these provisions could have transferred over $385 billion in wealth to Treasury from September 2008 to the present.

95.     A fair evaluation of the periodic commitment fee would have been that it would be valued at zero given all of the other consideration provided to Treasury.  Further, neither Treasury nor FHFA has ever attempted to value the periodic commitment fee.  At most, the periodic commitment fee would have been worth a small fraction of the unused portion of the Commitment,

somewhere between zero and 45 basis points multiplied by that committed but undrawn upon capital.  That would have translated into approximately one or two billion dollars a year, nowhere near enough to equal the excess dividends transferred to Treasury under the Net Worth Sweep (both the cash and in-kind versions).

96.     Likewise, the warrants entitled Treasury to receive 79.9% of the common stock, implicitly recognizing that private shareholders would continue to own the remaining 20.1%.

97.     For Treasury to take 100% of all profits and net worth of the Companies has unjustly enriched Treasury at the expense of private shareholders.  It has transferred billions of dollars in wealth to Treasury in excess of what the original PSPAs would have allowed Treasury to receive, without providing any additional consideration for that wealth.  The net effect has been to enrich the Treasury by billions of dollars while reducing the value of the privately held stock in the Companies, both common and preferred.

## VIII.    THE GOVERNMENT HAS TAKEN PLAINTIFFS' PROPERTY WITHOUT JUST COMPENSATION.

98.     There can be no doubt that the common stock of a company constitutes property protected by the Fifth Amendment.  The essence of that property is the right to receive dividends or liquidation proceeds paid out on a pro rata basis with other common stockholders, and to own the residual value generated by the company.

99.     Thus, prior to the imposition of the Net Worth Sweep, Plaintiffs had valuable vested property rights in their shares of Fannie Mae and Freddie Mac Common Stock.  The property owned by Plaintiffs included the right to participate in the profits and increased net worth of Fannie and Freddie (whether through dividends, redemptions, liquidation or otherwise) to the extent those profits and increased net worth exceeded the amounts needed to fully satisfy all obligations on the Senior Preferred Stock issued to Treasury in 2008.  The economic rights owned by the holders of Common Stock vested in their respective holders upon the holders'

acquisition of shares of Common Stock.

100.     The economic rights owned by Plaintiffs constitute private property protected by the Fifth Amendment of the United States Constitution.

101.     The Net Worth Sweep had the direct effect of transferring all of the property rights Plaintiffs owned in the Common Stock of Fannie and Freddie to the United States Treasury.  That constitutes a per se Taking of Plaintiffs' property rights under the Fifth Amendment.

102.     Moreover, at all times prior to the imposition of the Net Worth Sweep – including after the enactment of HERA, imposition of the conservatorship, and execution of the PSPAs – Plaintiffs had a reasonable, investment-backed expectation that their property would not be appropriated by the Government without payment of just compensation.

103.     Like investors in many publicly traded corporations and financial institutions, Plaintiffs' property rights were not unlimited.  Like many Common Shareholders, Plaintiffs' right to receive dividends was, in part, subject to the discretion of the Companies' boards, and Plaintiffs' right to receive liquidation payments was conditional on the companies being in liquidation and there being enough assets to pay out to more senior creditors (if any). And, like investors in every U.S. financial institution, the Plaintiffs' investments in the Companies was subject to the possibility that the Companies could be placed into conservatorship or receivership or bankruptcy in appropriate circumstances.  Plaintiffs' economic rights were nevertheless vested and valuable property protected by the Fifth Amendment.

104.     Simply because a dividend right may be subject to the discretion of a board of directors or majority shareholder does not render it valueless.  A contrary view would mean the Government could appropriate all the dividend rights of every share of stock in the country without paying just compensation.  Likewise, simply because the right to a distribution

in liquidation depends on certain contingencies does not render it valueless. A contrary view would mean the Government could appropriate all liquidation rights of every shareholder in the country without paying just compensation. Further, when both dividend rights and liquidation rights are appropriated, and when a company is forced to pay 100% of its net worth to the majority shareholder (thereby eliminating the possibility of redemption rights as well), then the economic rights of otherwise valuable stock has been fully expropriated and transferred to the majority shareholder. That is what the Third Amendment does without providing any just compensation in return. There is no precedent for the Government being able to do this to the shareholders of any kind of institution under any circumstances.

105.    No holder of Common Stock could have reasonably foreseen that the Government would effectively confiscate their shares by implementing the Net Worth Sweep. The Net Worth Sweep was unprecedented and contrary to the Governments' public statements that the Companies would be returned to shareholders. Never before in the history of the nation has the Government caused the *de facto* nationalization of a private corporation under the guise of a "conservatorship" by a federal agency and an "investment" by the Treasury. Prior to the Net Worth Sweep, such an action would have been unthinkable.

106.    Further, prior to the imposition of the Net Worth Sweep, Plaintiffs had a reasonable expectation that the Companies would be operated at a profit for the benefit of *all* stockholders and that the Companies would exercise their discretion to pay dividends in good faith. As described herein, such expectations were based upon numerous things including, at a minimum, the historical treatment of shareholders in all companies, including distressed companies and distressed financial institutions placed in federal conservatorship or receivership; the historical payment of dividends by the Companies; the basic economic rights of common stockholders under State law; the provisions of HERA providing for the purposes of conservatorships in restoring the Companies to sound operating condition, and even providing

38

for shareholders to retain their residual ownership rights even in a receivership and liquidation (which was never announced here); and the repeated public statements from the Government that the Companies, once stabilized, would be returned to normal operation and to the control and benefit of private shareholders.

107.    The Government's imposition of the Net Worth Sweep categorically deprived Plaintiffs of all economic value in their economic rights as shareholders, including rights to dividends, redemptions, or liquidation distributions, and thereby appropriated their property without payment of just compensation.

108.    Under the Net Worth Sweep, the Companies are no longer operated at a profit for the benefit of all stockholders, but are instead operated for the sole and exclusive benefit of Treasury.  The Net Worth Sweep has made it impossible for Plaintiffs ever to receive dividends or their respective liquidation value, or any portion thereof, because the Net Worth Sweep has the purpose and effect of ensuring that Fannie Mae and Freddie Mac will never have any funds available to pay a dividend on any privately held stock, to redeem the Government's Senior Preferred Stock (or any privately held stock), or to pay any liquidation proceeds to the holders of Common Stock (or any other privately held stock).  Thus, Fannie and Freddie will never have any funds available to distribute to the private holders of Common Stock, whether as dividends, redemptions, or liquidation proceeds.  The Net Worth Sweep permanently deprives Plaintiffs of their right to receive either dividends or their respective liquidation distributions upon liquidation of Fannie Mae and Freddie Mac *no matter how much net worth* Fannie Mae and Freddie Mac accumulate, or would have accumulated but for the Net Worth Sweep.

109.    The Government's imposition of the Net Worth Sweep has categorically rendered Plaintiffs' and the Class' economic rights a nullity and completely eradicated the value of those rights.  As described above, Treasury has to date received approximately $90 billion more than its total investment in the Companies and approximately $125 billion more

than it would have received under the 10% dividend provided for in the original Agreements. But for the Net Worth Sweep, the Companies would have been in a position to pay billions of dollars in profits to the private holders of Common Stock.

110.    Although the Government plainly has many other means of raising revenue and supporting the economic recovery that would not appropriate the property rights of private shareholders, the Net Worth Sweep has become a major source of revenue for the Government at the expense of Plaintiffs.

111.    While the Government has collected, and will continue to collect billions of dollars from Fannie Mae and Freddie Mac, Plaintiffs have not been provided just compensation, nor any compensation, for the Government's taking of all of the economic rights that they previously owned by virtue of their ownership of Common Stock.

## IX.   THE GOVERNMENT ALSO HAS TAKEN PLAINTIFFS' RIGHT TO BRING CERTAIN CAUSES OF ACTION CHALLENGING THE THIRD AMENDMENT WITHOUT PROVIDING JUST COMPENSATION.

112.    The Supreme Court has recognized that a cause of action is a species of property protected by the Due Process Clause. *E.g.*, *Richards v. Jefferson Cty., Ala.*, 517 U.S. 793, 804 (1996). The Court has also suggested that a cause of action is property for purposes of the Takings Clause. *E.g.*, *Dames & Moore v. Regan*, 453 U.S. 654, 691 (1981) (Powell, J., concurring). The Federal Circuit has held unequivocally that a cause of action constitutes a property right protected by the Takings Clause. *Adams v. United States*, 391 F.3d 1212, 1225-1226 (Fed. Cir. 2004); *Abrahim-Youri v. United States*, 139 F.3d 1462 (Fed. Cir. 1997); *All. of Descendants of Tex. Land Grants v. United States*, 37 F.3d 1478, 1481 (Fed. Cir. 1994).

113.    In the District Court for the District of Columbia, plaintiffs in a related action filed various direct claims seeking to enjoin the Third Amendment, as well as derivative claims on behalf of Fannie and Freddie challenging the Third Amendment.  In its July 2017 opinion, the D.C. Circuit ruled that the claims seeking injunctive relief were barred by HERA,

and the right to pursue derivative claims had been taken from the Companies' private shareholders by FHFA. *Perry Capital LLC v. Mnuchin,* 864 F.3d 591, 617-34 (D.C. Cir. 2017). The plaintiffs in that case petitioned the Supreme Court for review of the latter holding, which conflicts with (*inter alia*) the Federal Circuit's interpretation of a nearly identical provision. *See First Hartford Corp. Pension Plan & Tr. v. United States*, 194 F.3d 1279 (Fed. Cir. 1999). The Supreme Court denied the petition on February 20, 2018.

114.     Plaintiffs in this case assert that the Federal Circuit's decision in *First Hartford* was correct, and therefore HERA cannot be read as taking from the Companies' shareholders the right to bring derivative claims on behalf of the Companies where those claims are against the FHFA or Treasury, given the "manifest conflict of interest" preventing FHFA from ever bringing such claims. There are companion cases in this Court advancing such derivative claims. However, to the extent that any courts continue to hold that such derivative claims are not possible and thereby block the shareholders in Fannie and Freddie from obtaining a full and just recovery for the loss of their shareholder rights, we assert that such an interpretation of HERA, as applied to the facts of these cases and the Third Amendment, is itself a Taking without just compensation. We do not challenge the succession provision in HERA as a Taking on its face, and we do not claim that the conservatorship was a Taking. But the Third Amendment was a Taking and a nullification of Plaintiffs' shareholder rights, and the application of any HERA provision that prevents Plaintiffs from obtaining full relief from the Third Amendment is a Taking without payment of just compensation. This claim is advanced if and to the extent that Takings claim (or other claims) fail to provide the full just compensation to which Plaintiffs are entitled due to the application of any HERA provision to the cases that challenge the Third Amendment.

## X.     THE GOVERNMENT ILLEGALLY EXACTED PLAINTIFFS' PROPERTY.

115.     In the alternative to Plaintiffs' Takings Claims, the Third Amendment

constitutes an Illegal Exaction of Plaintiffs' property in violation of the Fifth Amendment.

116.   Under the Third Amendment, the Government took money from Plaintiffs by extracting the entire net worth of the Companies as a dividend on an ongoing and permanent basis, thereby assuring that Plaintiffs would not receive any future value from their investments in the company in the form of dividends or liquidation payments or in any other manner.

117.   The Third Amendment was unlawful as a matter of constitutional law because it was agreed to by the FHFA, which is an unconstitutional agency.  The Constitution does not authorize Congress to create an agency that is independent of the President and is fully controlled by a single Director whom the President cannot remove other than "for cause."  In addition, the Third Amendment was unlawful as a matter of constitutional law because it was agreed to by an FHFA "Acting Director" who had been acting as such for over three years at the time he agreed to the Third Amendment.  The Constitution does not allow any agency to be run by a person has not been properly appointed and confirmed for over three years.

118.   The Third Amendment was also not authorized by statute.  HERA directs that the FHFA, when acting as conservator, "may take such action as may be – (i) necessary to put the regulated entity in a sound and solvent condition; and (ii) appropriate to carry on the business of the regulated entity and preserve and conserve the assets and property of the regulated entity."  12 U.S.C. § 4617(b)(2)(D).  As FHFA has recognized in numerous statements, this is a binding and mandatory obligation that limits the scope of FHFA's authority when it acts as a conservator:

- Section 4617(b)(2)(D) is one of FHFA's "statutory *mandates*," and "FHFA, acting as conservator . . . , must follow the mandates assigned to it by statute."  FHFA STRATEGIC PLAN: FISCAL YEARS 2018-2022 4 (Sept. 27, 2017) (emphasis added), https://goo.gl/P7w6mP;

- FHFA has "statutory *obligations* to operate the [Companies] in a safe and sound

manner." Prepared Remarks of Melvin L. Watt, Dir., FHFA, at American Mortgage Conference (May 18, 2017) (emphasis added), https://goo.gl/ZPGBYA;

- FHFA's "statutory *mandates* obligate" it to "[c]onserve and preserve the assets of the Enterprises while they are in conservatorship." Statement of Melvin L. Watt, Dir., FHFA, Before the U.S. Senate Comm. on Banking, Housing, and Urban Affairs (May 11, 2017) (emphasis added), https://goo.gl/h44qRf;

- "FHFA, acting as conservator and regulator, *must follow the mandates* assigned to it by statute ....... FHFA's authority as both conservator and regulator of the Enterprises is based upon *statutory mandates* enacted by Congress to ensure a liquid, efficient, competitive, and resilient national housing finance market, ensure safe and sound Enterprise operations, as well as to preserve and conserve their assets." FHFA STRATEGIC PLAN: FISCAL YEARS 2015-2019  5, 14 (Aug. 15, 2014) (emphasis added), https://goo.gl/5BCKem;

- FHFA has a "conservatorship *mandate* to preserve and conserve the [Companies'] assets." Statement of Edward J. DeMarco, Acting Dir., FHFA, Before the U.S. Senate Comm. on Banking, Housing and Urban Affairs at 3 (Apr. 18, 2013) (emphasis added), https://goo.gl/ZrHAUF;

- As conservator, FHFA has a " 'preserve and conserve' *mandate*." FHFA, A STRATEGIC PLAN FOR ENTERPRISE CONSERVATORSHIPS: THE NEXT CHAPTER IN A STORY THAT NEEDS AN ENDING 7 (Feb. 21, 2012) (emphasis added), https://goo.gl/XwZxT7;

- "[T]he Conservator's *mandate* [is] to put the regulated entity in a sound and solvent condition and to preserve and conserve the assets and property of the regulated entity." Conservatorship and Receivership, 75 Fed. Reg. 39,462, 39,469 (July 9, 2010) (emphasis added);

- "The statutory role of FHFA as conservator *requires* FHFA to take actions to preserve and conserve the assets of the Enterprises and restore them to safety and soundness." FHFA, REPORT TO CONGRESS 2009 at 99 (May 25, 2010) (emphasis added), https://goo.gl/5BK9kH.

119.    HERA also limits the scope of FHFA's powers as conservator by distinguishing between the powers granted to FHFA when it acts in that role and when it acts as a receiver.  Specifically, HERA directs that when FHFA acts as a receiver, it must "place the regulated entity in liquidation and proceed to realize upon the assets of the regulated entity," and then distribute the proceeds to various stakeholders (including shareholders) according to a carefully-defined distribution schedule and pursuant to delineated statutory procedures.  12 U.S.C. §§ 4617(b)(2)(E), (b)(3)-(9), (c).  Under HERA – as under common law – receivership is

aimed at winding down a company's affairs and liquidating its assets, while conservatorship aims to rehabilitate the company and return it to normal operation.

120.    By giving away all of the Companies' net assets to the Treasury, the Third Amendment does not "preserve" or "conserve" those assets or move the companies toward a "sound and solvent condition." The Government has admitted that the Third Amendment rendered the Companies "effectively balance-sheet insolvent, a textbook illustration of financial instability." Further, as alleged above, the Government implemented the Third Amendment for the purpose of "winding down" the companies, to prevent them from ever accruing capital, and to ensure that they could not "escape" Government control or return to functioning as private entities. Each of these goals are fundamentally incompatible with HERA's statutory mandate that FHFA act as conservator to preserve and conserve the Companies' assets and demonstrates that the Third Amendment was an unlawful end run around HERA's careful delineation between the roles of conservatorship and receivership.

121.    The Third Amendment also violates HERA for several additional reasons. HERA grants FHFA the authority to "disaffirm or repudiate any contract" the Companies entered into prior to conservatorship when "the conservator determines" the "performance" of such contracts "to be burdensome" to the Companies. But such repudiation must occur "within a reasonable period following" FHFA's appointment as conservator. 12 U.S.C. § 4617(d)(1) & (2). The FHFA failed to repudiate the shareholder contracts held by Freddie Mac common shareholders "within a reasonable period" following the September 6, 2008 appointment of FHFA as conservator. Instead, the FHFA effected this repudiation only in August 2012 – four years after its appointment as conservator – by entering into the Third Amendment. That amendment fully repudiates and nullifies contract rights to dividends, liquidation distributions, and voting rights, but did so ***long after*** the expiration of the "reasonable" period in which the FHFA had statutory authority to do so. It was unlawful for this additional reason.

122.    Finally, HERA granted Treasury the authority to purchase securities issued by the Companies, but dictated that this authority expired on December 31, 2009. 12 U.S.C. §§ 1455(l), 1719(g).  In a recent filing in a related action, FHFA has characterized the Third Amendment as accomplishing "exactly the same thing" as a new issuance. Because the Third Amendment was implemented long after the expiration of Treasury's authority to purchase new shares, FHFA's characterization of the Third Amendment as "exactly the same" as the issuance of new securities would establish, if accepted, an additional basis for holding the Third Amendment to be unlawful.

123.   The government appropriated Plaintiffs' valuable property and contract rights and has the Plaintiffs' money in its pocket.  Because the Third Amendment was unlawful under HERA for the numerous reasons set forth above, it constitutes an Illegal Exaction.

## XI.    THE THIRD AMENDMENT VIOLATED THE CONTRACTUAL RIGHTS OF HOLDERS OF THE FREDDIE MAC COMMON STOCK.

124.    Plaintiff Brown and other owners of Freddie Mac Common Stock owned stock with CUSIP number 313 400 301, traded under the ticker symbol FMCC.

125.    This Freddie Common Stock was certificated with specific Certificates of Designation governing all shares of common stock.

126.    The Certificate of Designation for the Common Stock issued by Freddie Mac also constitutes a contract with provisions governing the holders' dividend and liquidation rights.  These provisions provide, in pertinent part:

### 1.   DIVIDENDS.

(a) The holders of outstanding shares of Common Stock shall be entitled to receive, ratably, dividends (in cash, stock or other property), when, as and if declared by the Board of Directors out of assets legally available therefor. The amount of dividends, if any, to be paid to holders of the outstanding Common Stock from time to time and the dates of payment shall be fixed by the Board of Directors of Freddie Mac (the "Board of Directors"). Each such dividend shall be paid to the holders of record of outstanding shares of the Common

Stock as they appear in the books and records of Freddie Mac on such record date, not to be earlier than 45 days nor later than 10 days preceding the applicable dividend payment date, as shall be fixed in advance by the Board of Directors.

* * *

## 2. **LIQUIDATION RIGHTS.**

(a) Upon the dissolution, liquidation or winding up of Freddie Mac, after payment of or provision for the liabilities of Freddie Mac and the expenses of such dissolution, liquidation or winding up, and after any payment or distribution shall have been made on any other class or series of stock of Freddie Mac ranking prior to the Common Stock upon liquidation, the holders of the outstanding shares of the Common Stock shall be entitled to receive out of the assets of Freddie Mac available for distribution to stockholders, before any payment or distribution shall be made on any other class or series of stock of Freddie Mac ranking junior to the Common Stock upon liquidation, the amount of $0.21 per share, plus a sum equal to all dividends declared but unpaid on such shares to the date of final distribution. The holders of the outstanding shares of any class or series of stock of Freddie Mac ranking prior to, on a parity with or junior to the Common Stock upon liquidation shall also receive out of such assets payment of any corresponding preferential amount to which the holders of such stock may, by the terms thereof, be entitled. Thereafter, subject to the foregoing and to the provisions of paragraph (b) of this Section 8, the balance of any assets of Freddie Mac available for distribution to stockholders upon such dissolution, liquidation or winding up shall be distributed to the holders of outstanding Common Stock in the aggregate.

(b) Notwithstanding the foregoing, upon the dissolution, liquidation or winding up of Freddie Mac, the holders of shares of the Common Stock then outstanding shall not be entitled to be paid any amounts to which such holders are entitled pursuant to paragraph (a) of this Section 8 unless and until the holders of any classes or series of stock of Freddie Mac ranking prior upon liquidation to the Common Stock have been paid all amounts to which such classes or series of stock are entitled pursuant to their respective terms.

* * *

## 3. **MISCELLANEOUS.**

* * *

(h)(ii) The affirmative vote by the holders of shares representing at least 66 2/3% of all of the shares of the Common Stock at the time outstanding and entitled to vote, voting together as a class, shall be necessary for authorizing, effecting or validating the amendment, alteration, supplementation or repeal of any of the provisions of this Certificate if such amendment, alteration, supplementation or repeal would materially and adversely affect the powers, preferences, rights, privileges, qualifications, limitations, restrictions, terms or conditions of the Common Stock.

127.   Thus, owners of Freddie Common Stock had contractual rights to dividends and liquidation rights, as well as a right to exclude the Companies from destroying these rights. Plaintiff Brown and the other owners of Freddie Common Stock paid valuable consideration in exchange for these contractual rights, and in doing so helped provide financial support for Fannie Mae and Freddie Mac's business both before and after the imposition of the conservatorship.

128.   In addition to their explicit terms, inherent in the Certificates was an implied covenant by Freddie Mac, and FHFA (as their conservator) to deal fairly with the stockholders and to fulfill the issuers' contractual obligations in good faith.  This covenant required FHFA not to take actions that would violate the stockholders' reasonable expectations regarding their dividend and liquidation rights.

129.   By executing the Third Amendment, the Government has not only breached the express terms of the shareholder contracts, but has also acted unfairly and in bad faith with respect to the stockholders and breached the implied covenant of good faith and fair dealing.

## XII.   CLASS ACTION ALLEGATIONS.

130.   Plaintiffs bring this action on behalf of themselves and as a class action pursuant to the Court of Federal Claims' Rules of Civil Procedure 23 on behalf of: a class consisting of all persons and entities who held common stock in Fannie Mae on August 17, 2012 and who were damaged thereby, and their successors in interest (meaning current shareholders) (the "Fannie Common Class"); and a class consisting of all persons and entities who held common stock in Freddie Mac on August 17, 2012 and who were damaged thereby, and their successors in interest (meaning current shareholders) (the "Freddie Common Class").  Excluded from both classes are the Defendants.

131.   Wazee Plaintiffs also bring this action on behalf of all current owners of preferred stock in Fannie Mae, and on behalf of all current owners of preferred stock in Freddie Mac.

132.   The members of the Classes are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least thousands of members in the proposed Classes.  As of August 17, 2012, and the date of the filing of this action, there were hundreds of millions of shares of Fannie Mae and Freddie Mac Common Stock outstanding.

133.   Plaintiffs' claims are typical of the claims of the other members of the Classes, as all members of the Classes were similarly affected by Defendants' wrongful conduct that is complained of herein.

134.   Plaintiffs will fairly and adequately protect the interests of the members of the Classes, and have retained counsel competent and experienced in class action, derivative, securities, and constitutional litigation.  Plaintiffs have no interests that are adverse or antagonistic to the Classes.

135.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Because the damages suffered by individual members of the Classes may be relatively small, the expense and burden of individual litigation make it impracticable for Class members individually to seek redress for the wrongful conduct alleged herein.

136.   Common questions of law and fact exist as to all members of the Classes and predominate over any questions solely affecting individual members of the Classes.  Among the questions of law and fact common to the Classes are:

(a)   Whether Defendant took Plaintiffs' property without just compensation;

(b)    Whether Defendant illegally exacted Plaintiffs' property;

(c)    Whether Defendant breached the terms of its shareholder contracts;

(d)    Whether Defendant has been unjustly enriched by the
Net Worth Sweep;

(e)    Whether Defendant is liable for damages to the members of the
Classes, and the proper measure thereof, for taking, illegal exaction,
breach of contract, breach of the implied covenant of good faith and
fair dealing, breach of fiduciary duties, and/or unjust enrichment.

137.   The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications with respect to the individual Class members, or adjudications with respect to individual Class members that would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair their ability to protect their interests.

138.   Defendant has acted on grounds generally applicable to the Classes with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Classes as a whole.

## COUNT I

## TAKING WITHOUT JUST COMPENSATION

139.   Plaintiffs incorporate by reference and reallege each and every allegation contained in the preceding paragraphs, as though fully set forth herein.

140.   The Fifth Amendment provides that no person shall "be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation."

141.   As holders of Common and Preferred Stock, Plaintiffs owned fully vested property rights in the form of the rights to receive dividends, liquidation proceeds, or other distributions in accordance with the terms of their Common and Preferred Stock.  These property

49

rights included a claim on the companies' equity that could be paid out in the form of dividends or liquidation payment. They also included a right to protect those economic rights through voting rights.

142.    These property rights survived the events of 2008, including the enactment of HERA, the imposition of conservatorships over the Companies, and the issuance of Senior Preferred Stock to the U.S. Treasury pursuant to the PSPA.

143.    At all relevant times up to the imposition of the Third Amendment, Plaintiffs had a reasonable, investment-backed expectation that their property rights would be preserved and would not be taken by the Government without just compensation.

144.    By imposing the Net Worth Sweep, the Government took Plaintiffs' vested property rights without just compensation. The Net Worth Sweep expropriated Plaintiffs' property interests, destroyed Plaintiffs' investment-backed expectations, and deprived Plaintiffs of all economically beneficial uses of their Common and Preferred Stock.

145.    The Net Worth Sweep was implemented by two federal agencies – the FHFA and the U.S. Treasury – to advance the economic and political interests of the U.S. Government. The U.S. Government (including FHFA and Treasury) provided no compensation whatsoever, let alone just compensation, to Plaintiffs and other private holders of Common and Preferred Stock for the expropriation of their property rights.

146.    Plaintiffs are entitled to just compensation for the Government's taking of their property.

147.    Plaintiffs suffered damages as a direct and proximate result of the foregoing unconstitutional taking. Plaintiffs' injuries are direct and independent of any injury to the Companies and any recovery for this Taking claim would benefit the stockholders directly, and not the Companies.

**COUNT II**

## TAKING WITHOUT JUST COMPENSATION (CAUSES OF ACTION)

148.   Plaintiffs incorporate by reference and reallege each and every allegation contained in the preceding paragraphs, as though fully set forth herein.

149.   The Fifth Amendment provides that no person shall "be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation."

150.   As holders of Common and Preferred Stock, Plaintiffs had the right to protect their investment by filing certain causes of action, including derivative lawsuits and claims seeking injunctive and declaratory relief.

151.   These causes of action constitute property rights protected by the Fifth Amendment.

152.   After the Government imposed the Third Amendment, other plaintiffs filed direct claims seeking to enjoin the Third Amendment, as well as derivative claims on behalf of the Companies challenging the Third Amendment.  The D.C. Circuit has ruled that these derivative claims, which accrued on August 17, 2012 – the date of the Third Amendment – were taken away by the Government.  That D.C. Circuit decision conflicts with a decision of the Federal Circuit in *First Hartford Corp. Pension Plan & Tr. v. United States*, 194 F.3d 1279 (Fed. Cir. 1999).

153.   To the extent Plaintiffs are prevented from receiving a full remedy for the harm caused by the Third Amendment by virtue of any court's holding that certain HERA provisions block legal actions needed to fully remedy the harm caused by the Third Amendment, the application of those provisions to the Plaintiffs' challenges to the Third Amendment constitute a taking of private property without payment of just compensation.

154.   Plaintiffs suffered damages as a direct and proximate result of the foregoing unconstitutional taking. Plaintiffs' injuries are direct and independent of any injury to

the Companies and any recovery for this Taking claim would benefit the stockholders directly, and not the Companies.

## COUNT III

## ILLEGAL EXACTION

155.    Plaintiffs incorporate by reference and reallege each and every allegation contained in the preceding paragraphs, as though fully set forth herein.

156.    The Fifth Amendment provides that no person shall "be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation."

157.    As holders of Common and Preferred Stock, Plaintiffs had vested property rights to participate in the Companies' income stream and share their residual value. These property rights included a claim on the companies' equity that could be paid out in the form of dividends or liquidation payment.

158.   These property rights survived the events of 2008, including the enactment of HERA, the imposition of conservatorships over the Companies, and the issuance of Senior Preferred Stock to the U.S. Treasury.

159.   Plaintiffs had a reasonable, investment-backed expectation that their property rights would not be illegally exacted by the Government.

160.   By imposing the Net Worth Sweep, the Government expropriated Plaintiffs' vested property rights and now has the Plaintiffs' money in its pocket.

161.    The Net Worth Sweep was developed and implemented by two federal agencies – the FHFA and the U.S. Treasury – to advance the economic and political interests of the U.S. Government.

162.    By agreeing to and implementing the Third Amendment, FHFA and Treasury each violated the scope of their statutory authority under HERA.  In addition, FHFA

acted unlawfully because it is an unconstitutional "independent" agency.  It also acted unlawfully because it had no lawfully appointed and confirmed director, but instead had only an "Acting Director" who had been in place for over three years, which is constitutionally impermissible.

163.   Plaintiffs are entitled to damages to compensate them for the loss of these illegally exacted property rights and funds.

164.   Plaintiffs suffered damages as a direct and proximate result of the foregoing illegal exaction.  Plaintiffs' injuries are direct and independent of any injury to the Companies and any recovery for this claim would benefit the stockholders directly, and not the Company.

## COUNT IV

## BREACH AND ANTICIPATORY REPUDIATION OF FREDDIE MAC SHAREHOLDER CONTRACT

165.   Plaintiffs incorporate by reference and reallege each and every allegation contained in the preceding paragraphs, as though fully set forth herein.

166.   The Certificates for the Freddie Mac Common and Preferred Stock constitute contracts between shareholders, on the one hand, and Freddie Mac, on the other.

167.   These contracts include certain rights to dividends, liquidation payments, and voting rights as alleged above.

168.   Plaintiffs paid valuable consideration in exchange for these contractual rights.

169.   FHFA assumed the responsibility to act consistently with the Companies' contractual obligations when it became the Companies' conservator.

170.   The Net Worth Sweep was developed and implemented by the FHFA and the U.S. Treasury to advance the economic and political interests of the U.S. Government.

171.   By entering into the Third Amendment, the Government has deprived Plaintiffs of any possibility of receiving any dividends or any liquidation distribution, and has

done so without providing Plaintiffs any opportunity to vote.  Accordingly, the Government

has breached and unequivocally repudiated the Plaintiffs' contractual rights.

172.   Plaintiffs suffered damages as a direct and proximate result of the

foregoing breach of contact.  Plaintiffs' injuries are direct and independent of any injury to

the Companies and any recovery would benefit the stockholders directly, and not the

Companies.

## COUNT V

## BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING OF FREDDIE MAC SHAREHOLDER CONTRACT

173.   Plaintiffs incorporate by reference and reallege each and every allegation

contained in the preceding paragraphs, as though fully set forth herein.

174.   The Certificates for Freddie Mac Common and Preferred Stock were

and are, for all purposes relevant hereto, contracts between the Plaintiffs and the

Companies.

175.   The Certificates provide for certain rights to dividends, liquidation

payments, and voting rights. Also inherent in these contracts was, and is, an implied covenant

of good faith and fair dealing, requiring the Companies to deal fairly with Plaintiffs, to fulfill

their obligations in good faith, and not to deprive Plaintiffs of the fruits of their bargain.

176.   Plaintiffs paid valuable consideration in exchange for these contractual

rights.

177.   FHFA assumed the responsibility to act consistently with the Companies'

contractual obligations when it became the Companies' conservator, including the covenant of

good faith and fair dealing.

178.   The Net Worth Sweep was developed and implemented by two federal

agencies – the FHFA and the U.S. Treasury – to advance the economic and political interests

of the U.S. Government.

179.   By entering into the Third Amendment with the purpose of depriving Plaintiffs of any possibility of receiving dividends or a liquidation preference without any opportunity to vote, the Government has breached the implied covenant of good faith and fair dealing inherent in the Certificates for the Common and Preferred Stock.

180.   Plaintiffs suffered damages as a direct and proximate result of the foregoing breach of the implied covenant of good faith and fair dealing.  Plaintiffs' injuries are direct and independent of any injury to the Companies and any recovery for this claim would benefit the stockholders directly, and not the Company.

## COUNT VI

## BREACH AND ANTICIPATORY REPUDIATION OF FANNIE MAE SHAREHOLDER CONTRACT

181.   Plaintiffs incorporate by reference and reallege each and every allegation contained in the preceding paragraphs, as though fully set forth herein.

182.   When Fannie Mae issued Common and Preferred Stock, it necessarily agreed to treat its shareholders in accordance with its charter, its by-laws, and the Delaware General Corporation Law ("DGCL").  Thus, Fannie Mae stock is governed by a contract consisting of Fannie Mae's charter, by-laws, and the DGCL (the "Fannie Mae Common and Preferred Stock Contract").

183.   When FHFA placed Fannie Mae into conservatorship, it succeeded to all rights, titles, powers, and privileges of Fannie Mae, and thereby assumed Fannie Mae's rights and obligations under its contract with Common and Preferred Stock shareholders.  Since FHFA is a government agency, the Government became a party to the Fannie Mae shareholder contracts when FHFA succeeded to that contract as Fannie Mae's conservator.

184.   Under the Fannie Mae Common and Preferred Stock Contract, the Government is obligated it to operate Fannie Mae in a manner that respects the rights of Fannie Mae's shareholders, as recognized in Fannie Mae's Charter, and to refrain from actions that

eliminate those shareholder rights or otherwise violate applicable Delaware laws.  The Government breached these contractual obligations when it imposed the Net Worth Sweep.

185.    The Fannie Mae Common and Preferred Stock Contract is a product of both federal and Delaware law.  As a matter of federal law, Fannie Mae's Charter, including the powers and privileges set forth therein, is a contract between and among the Government (as granter of the charter), Fannie Mae, and Fannie Mae's shareholders.

186.    In addition, Fannie Mae's Charter, the Fannie Mae Bylaws and the DGCL form a binding and enforceable contract among Fannie Mae, its directors, officers, and shareholders under Delaware law, to the extent that contract is not inconsistent with Fannie Mae's Charter and other federal law, rules and regulations.  Section 1710.10 of the OFHEO corporate governance regulation, 12 C.F.R. §1710.1, *et seq*., provides that, to the extent not inconsistent with Fannie Mae's Charter, other federal laws, rules and regulations, and the "safe and sound" operations of Fannie Mae, Fannie Mae must follow the corporate governance practices and procedures of the law of the jurisdiction in which the principal office of Fannie Mae is located; the DGCL; or the Revised Model Business Corporation Act.  Section 1.05 of the Fannie Mae Bylaws provides that, to the extent not inconsistent with Fannie Mae's Charter and other federal laws, rules and regulations, Fannie Mae "has elected to follow the applicable corporate governance practices and procedures of the Delaware General Corporation Law, as the same may be amended from time to time."  Under Delaware law, the DGCL, a corporation's charter and its bylaws together form a contract among the corporation, its directors, officers and shareholders.  *See Airgas, Inc. v. Air Products and Chemicals, Inc.*, 8 A.3d 1182, 1188 (Del. 2010).  Thus, Fannie Mae's Charter, the Fannie Mae Bylaws and the DGCL form the Fannie Mae Common and Preferred Stock Contract, a binding and enforceable contract among Fannie Mae, its directors, officers, and shareholders (albeit a contract that cannot require Fannie Mae to act inconsistently with Fannie Mae's Charter and other federal law, rules, and regulations).

187.    Fannie Mae's Charter provides that Fannie Mae "shall have common stock," "may have preferred stock," 12 U.S.C. §1718(a), contemplates that such "shares of common stock" will be "purchase[d]," "h[e]ld," and "dispose[d] of . . . subject to the provisions of [Fannie Mae's Charter]," *id*. §1718(d), and expressly recognizes Fannie Mae's status as a "private shareholder- owned company." *Id*. §1719(g)(1)(C)(v).

188.    The DGCL recognizes property rights associated with Common and Preferred Stock. *See, e.g.*, DGCL §159 (shares of stock "shall be deemed personal property"). DGCL §151(c) protects the right of common shareholders to participate in any net profits or residual value by providing that preferred shareholders "shall be entitled to receive dividends at such rates" (emphasis added) as stated and which "shall be . . . payable in preference to, or in such relation to, the dividends payable on any other class" of stock, so that "[w]hen dividends upon the preferred . . . stock, if any, to the extent of the preference to which such stock are entitled, shall have been paid . . . a dividend on the remaining class or classes or series of stock may then be paid out of the remaining assets of the corporation available for dividends."

189.    The dividends paid under the Net Worth Sweep are not "dividends *at such rates*," as required by Section 151(c).  The Net Worth Sweep sets no rate and replaces the 10% fixed dividend rate on the Treasury's Senior Preferred Stock with a perpetual, unlimited requirement that Fannie Mae pay its entire profit to Treasury without regard to the capital attributable to Treasury or other shareholders, or the shareholders' right to a return in the amount of Fannie Mae's residual value.

190.    The Net Worth Sweep also violates Section 151(c)'s requirement that dividends be "payable in preference to, or in . . . relation to, the dividends payable on any other class or classes or of any other series of stock[.]"  Because no earnings remain available to pay any dividends to shareholders other than Treasury after payment of the Net Worth Sweep, the Treasury's Senior Preferred Stock does not carry a permissible dividend "preference," nor is the

Net Worth Sweep "in . . . relation to" dividends payable to any other shareholders.

191.   By violating Section 151(c), the Net Worth Sweep breaches the Fannie Mae Common and Preferred Stock Contract.

192.   The DGCL does not permit a corporation to have preferred stock if the corporation does not also have common stock entitled to receive the residual value that remains after the preferred stock's preference has been paid.  Preferred stock that entitles its holder to receive all the value of the corporation, leaving no residuum for common shareholders under any set of circumstances, is unlawful and its creation is a breach of the Fannie Mae Common and Preferred Stock Contract.

193.   The Net Worth Sweep makes it impossible for Fannie Mae to pay dividends or other distributions in respect of its common and preferred shares.  Because the Net Worth Sweep entitles the Government to Fannie Mae's entire value, it violates the DGCL, which is part of the Fannie Mae Common and Preferred Stock Contract.

194.   The Government breached the Fannie Mae Common and Preferred Stock Contract by entering into the Third Amendment and agreeing to replace the Treasury's Senior Preferred Stock's original dividend with the Net Worth Sweep, which entirely extinguishes Fannie Mae's net and residual value by giving the Government Fannie Mae's entire net worth by 2018, in violation of the shareholders' contractual rights.

195.   Plaintiffs' claims are ripe.  The Third Amendment was a voluntary affirmative act that amounts to a repudiation of the Fannie Mae Common and Preferred Stock Contract.

196.   The property rights associated with private ownership of Fannie Mae's Common and Preferred Stock are also explicitly recognized by Fannie Mae's Charter.  The property rights associated with private ownership of Common and Preferred Stock under the DGCL are consistent with Fannie Mae's Charter and are not inconsistent with any other

Federal law, rules and regulations (including HERA).  These property rights comprise binding and enforceable provisions of the Fannie Mae Common and Preferred Stock Contract.

197.   Pursuant to 12 U.S.C. §4617(b)(2), FHFA, as conservator of Fannie Mae, succeeded to all rights, titles, powers and privileges of Fannie Mae and its shareholders, officers and directors, and became otherwise authorized to act on behalf of Fannie Mae and its shareholders, officers and directors, and, thus, was bound by Fannie Mae's Charter and the Fannie Mae Common and Preferred Stock Contract.

198.   As a result of the Government's breach of the Fannie Mae Common and Preferred Stock Contract, Plaintiffs, as common and preferred shareholders in Fannie Mae, have suffered damages in an amount to be determined at trial.

## COUNT VII

## BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING IN FANNIE MAE COMMON STOCK CONTRACT

199.   Plaintiffs incorporate by reference and reallege each and every allegation contained in the preceding paragraphs, as though fully set forth herein.

200.   As alleged in Count VI, above, the Fannie Mae Charter, together with its by-laws and the DGCL, constitute the Fannie Mae Common and Preferred Stock Contract governing Fannie Mae's obligations to its stockholders.  The Government is bound by that contract because FHFA succeeded to that contract when it became Fannie Mae's conservator.

201.   Fannie Mae's Charter provides that Fannie Mae "shall have common stock," "may have preferred stock," and expressly recognizes Fannie Mae's status as a "private shareholder-owned company." 12 U.S.C. §1718(a), §1719(g)(1)(C)(v). Under general corporate law principles, a corporation's shareholders have, collectively, a right to the corporation's residual value through a right to participate in the corporation's residual earnings and a right, upon dissolution, to share in any residual proceeds from liquidation of the assets.  Thus, under Fannie Mae's Charter, the Government agreed that shareholders of Fannie Mae would have

stock that is vested with a right to the residual value of Fannie Mae, including to share in Fannie Mae's earnings.

202.    Because Fannie Mae's Charter is a contract, it imposes on the Government an implied covenant of good faith and fair dealing in its performance and enforcement of the contract.  The covenant of good faith and fair dealing requires the Government to refrain from taking actions that interfere with other contracting parties' enjoyment of the benefits contemplated by the contract.

203.    Through the Net Worth Sweep, the Government breached the implied covenant of good faith and fair dealing.  Fannie Mae's common and preferred shareholders have a right to share in Fannie Mae's residual value.  As a result of the Net Worth Sweeps, the Government has nullified the shareholders' right to participate in the residual value of Fannie Mae by sending all of Fannie Mae's profits and net worth to Treasury, less a dwindling capital reserve that will also be transferred to Treasury.  Thus, the shareholders are deprived of any and all actual or potential value of the shares they own in perpetuity.

204.    Plaintiffs' claims are ripe.  The Third Amendment was a voluntary affirmative act that amounts to a repudiation of the Fannie Mae Charter.

205.    As a result of the Government's breach of the covenant of good faith and fair dealing, Plaintiffs, as shareholders in Fannie Mae, have suffered damages in an amount to be determined at trial.

## COUNT VIII

## BREACH OF FIDUCIARY DUTY

206.    Plaintiffs incorporate by reference and reallege each and every allegation contained in the preceding paragraphs, as though fully set forth herein.

207.    The conservatorship provisions of HERA create a fiduciary relationship between an agency of the United States Government (FHFA), on the one hand, and the

Companies' shareholders, on the other.  The Government therefore has a fiduciary responsibility to manage the conservatorships of Fannie and Freddie for the benefit of the Companies' shareholders—or at least in a manner that is not expressly understood and intended to be directly adverse to the interests of the shareholders, and intended to benefit the Government and to harm the shareholders.

208.   Given the existence of a fiduciary relationship between FHFA and the Companies' shareholders, it follows that the Government should be liable in damages for the breach of its fiduciary duties.

209.   The Net Worth Sweep is a self-dealing transaction between two sister agencies of the Government, and improperly (and in bad faith) expropriates the economic interest in Fannie and Freddie held by the Companies' private Common and Preferred Stockholders for the benefit of the Government.

210.   The Net Worth Sweep was neither entirely fair nor intrinsically fair.  It was manifestly unfair.

211.   The Net Worth Sweep constituted waste, gross and palpable overreaching and a gross abuse of discretion.

212.   The Net Worth Sweep did not further any valid business purpose or reasonable business objective of Fannie and Freddie, did not reflect FHFA's good faith business judgment of what was in the best interest of Fannie and Freddie or their shareholders, and was unfair to the Companies and their Common and Preferred Stockholders.

213.   Thus, by entering the Net Worth Sweep, FHFA violated its fiduciary duty to Plaintiffs.

214.   Plaintiffs suffered damages as a direct and proximate result of the foregoing breach of fiduciary duties.  Plaintiffs' injuries are direct and independent of any injury to the Companies and any recovery for this claim would benefit the stockholders

directly, and not the Company.

## COUNT IX

## DERIVATIVE CLAIM ON BEHALF OF FANNIE MAE

215.   Plaintiffs incorporate by reference and reallege each and every allegation contained in the preceding paragraphs, as though fully set forth herein.

216.   To the extent any of the direct claims brought by Wazee Plaintiffs and Douglas Whitley on behalf of Fannie Mae Common and Preferred Classes (together, the "Fannie Classes") above are held to be derivative claims, they bring those claims on a derivative basis on behalf of Fannie Mae.

217.   In addition to appropriating and illegally exacting the property of Fannie Mae shareholders, the Third Amendment also appropriated and illegally exacted the property of Fannie Mae.  Plaintiffs and the Fannie Classes are entitled to bring this derivative claim on Fannie Mae's behalf.

218.   Moreover, if the Third Amendment is held to have been entered into in violation of HERA or the Constitution, then it is unlawful and void.

219.   As a party to an unlawful and void agreement, Fannie Mae is entitled to seek a return of all amounts transferred to Treasury pursuant to the Third Amendment.  Plaintiffs and the Fannie Classes are entitled to bring this derivative claim on Fannie Mae's behalf to seek that relief.

220.   In addition, Fannie Mae is entitled to reformation of the underlying PSPA to invalidate and excise the Third Amendment.  Plaintiffs and the Fannie Classes are entitled to bring this derivative claim on Fannie Mae's behalf to seek that relief.

221.   Fannie Mae has suffered injury as a direct and proximate result of the unlawful Third Amendment, including monetary damage.

222.   Fannie Mae is controlled by FHFA, which was a party to, and as an

agency of the Government benefitted from, the illegal and unconstitutional actions challenged here.  FHFA is therefore not disinterested with regard to Plaintiffs' claims, and thus it would be futile to demand that FHFA bring these claims on behalf of Fannie Mae.  Additionally, Plaintiffs' alternative derivative claim is not a collusive action intended to confer jurisdiction on this Court that it would otherwise lack and they were shareholders at the time of the transaction complained of.  Plaintiffs and the Fannie Classes are therefore entitled to bring these claims on a derivative basis on Fannie's behalf, to the extent the claims are held to be derivative rather than direct.

## COUNT X

### UNJUST ENRICHMENT (on behalf of all shareholder classes)

223.    All of the foregoing allegations are incorporated herein.

224.    This Court has jurisdiction to hear all claims for money damages against the United States based on, among other things, "an express or implied contract with the United States."

225.    A claim of unjust enrichment is considered a claim based on an implied contract, and thus this Court has jurisdiction to hear such a claim.

226.    The United States has been unjustly enriched by the Net Worth Sweep.  As a result of both the cash and in-kind Net Worth Sweep, the United States Treasury has received approximately $330 billion in senior preferred dividends or net worth increases to its Liquidation Preferences, which is approximately $150 billion more in senior preferred dividends than it would have received under the original terms of the PSPAs.

227.    Even after taking into account the Treasury's right to exercise warrants to acquire 79.9% of the Common Stock in each Company for a nominal price, and its possible ability to receive a reasonable, market value based periodic commitment fee, it is clear that the Treasury has received tens of billions of dollars more than it could possibly have received under

the original PSPAs.  Thus, Treasury has been unjustly enriched by the amount it has received that exceeds what it would have received under the original terms of the PSPAs.

228.   The private shareholders in Fannie Mae and Freddie Mac, both preferred and common shareholders, have been impoverished by Treasury's enrichment.  Had Treasury not received the tens of billions of dollars in excess amounts it has received under the Net Worth Sweep, the value of the privately owned Preferred and Common shares in both Fannie Mae and Freddie Mac would be worth much more than they are currently worth.

229.   Further, if the original PSPA capital structure been left in place, and had Treasury sought to receive the same amount of wealth it has received since August 2012, the Companies would have been legally required to pay billions of dollars to the private shareholders.  Absent the Net Worth Sweep, and under the original PSPA terms, the only way Treasury could have received anything approximating the $385 billion of wealth it has actually received would have been by exercising its warrants to acquire the Common Stock, and then authorizing the payment of dividends on that Common Stock.  Doing so would have required the Companies, as a matter of law and contract, to pay dividends to both the private preferred shareholders and the common shareholders in each Company.

230.   Thus, the Net Worth Sweep simultaneously enriched the U.S. Treasury and impoverished the private preferred and common shareholders in both Fannie Mae and Freddie Mac.  The enrichment of Treasury itself has caused, and continues to cause, the impoverishment of the private shareholders.

231.   Nothing justified the Net Worth Sweep.  No consideration was provided in exchange for the Net Worth Sweep, let alone consideration that was remotely commensurate with giving away 100% of the profits of the Companies in perpetuity.  Further, the rationales offered by the Government for implementing the Net Worth Sweep fail to justify it.  It was not needed to appease concerns on the part of GSE bond and MBS investors about the circular

dividends materially eroding the Treasury Commitment, for numerous reasons.  By the summer

of 2012, the Companies were beginning to record large profits above the 10% dividend amount,

allowing them to build net worth.  The Companies expected sustained profitability in the

coming years, which would allow for a reversal of certain accounting write downs, most

notably the deferred tax assets, leading to large increases in net worth – which would eliminate

any need to draw from Treasury to pay dividends.  Further, the Net Worth Sweep was not a

reasonable measure for winding down the Companies as it violated the purposes of the

conservatorship, and a wind down required action from Congress that was not forthcoming and

has not happened.  The Companies are larger now than they were in 2012, as was reasonably

foreseeable at the time.  In any event, there is nothing that justifies the Government changing

the terms of the original PSPAs in a way that allowed it to take 100% of all GSE profits.

232.    There has proven to be no remedy at law for the unjust enrichment of the

Treasury that has harmed and impoverished private shareholders.

233.    Accordingly, private shareholders have a valid claim of unjust

enrichment against the United States Treasury.

234.    The named plaintiffs in this complaint bring unjust enrichment claims on

behalf of the following classes:  (a) all common shareholders in Fannie Mae, (b) all common

shareholders in Freddie Mac; (c) all preferred shareholders in Fannie Mae; and (d) all preferred

shareholders in Freddie Mac.

## COUNT XI

## UNJUST ENRICHMENT (Derivative Claim on behalf of Fannie Mae)

235.    All of the foregoing allegations are incorporated herein.

236.    As alleged above, the Net Worth Sweep has unjustly enriched Treasury

at the expense of all private shareholders in Fannie Mae.

237.    In addition, the Net Worth Sweep has unjustly enriched Treasury at the

expense of Fannie Mae.  From January 2013 through to the end of the second quarter of 2019, the Net Worth Sweep caused the Companies to pay approximately $123 billion more in senior preferred dividends to the Treasury than would have been paid under the original PSPAs' 10% senior preferred dividend.  But for the Net Worth Sweep, either that excess cash would have been paid out to both Treasury and private shareholders, triggering an unjust enrichment or other compensation right on the part of private shareholders, or it would have been held by the Companies (or some combination of the two).  Thus, to the extent there is a finding that Fannie Mae would have retained some or all of that $123 billion in excess cash, Fannie Mae has a claim for unjust enrichment against the Treasury.

238.    While Fannie Mae has a contract with Treasury, Fannie Mae has no power to make its own decisions with respect to that contract.  It was the FHFA as conservator that forced Fannie Mae to agree to the Net Worth Sweep and all related amendments.  Given this coercion by the FHFA, Fannie Mae should be permitted to bring an unjust enrichment claim against the Treasury.

239.    This derivative claim is brought on behalf of Fannie Mae.

240.    It would be futile to demand that Fannie Mae bring this claim itself, because it is controlled by the FHFA, a government agency that agreed to the Net Worth Sweep and has zealously defended it in multiple court actions.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs prays for relief and judgment, as follows:

1.      Certifying that this action is a proper class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Classes defined herein;

2.      Finding that the Defendant has taken Plaintiffs' property without just compensation, has illegally exacted Plaintiffs' property, has breached the express and implied terms of Plaintiffs' contracts, and has been unjustly enriched at the expense of private shareholders and/or the Companies;

3.      Determining and awarding to Plaintiffs and the Classes the just compensation and/or damages sustained by them as a result of the violations set forth above;

4.      On Count IX, ordering restitution and reformation as appropriate to ensure full compensation to Fannie Mae and the Fannie Classes for damages suffered from the Third Amendment;

5.      Awarding Plaintiffs prejudgment interest on any damages or just compensation to which Plaintiffs are entitled;

6.      Awarding Plaintiffs their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

7.      Granting such other and further relief as the Court may deem just and proper.

Dated:  March 24, 2023                              Respectfully Submitted,

                                                    */s/ Hamish P.M. Hume*
                                                    Hamish P.M. Hume
                                                    *Attorney of Record*
                                                    BOIES SCHILLER FLEXNER LLP
                                                    1401 New York Ave., N.W.
                                                    Washington, DC 20005
                                                    Tel: (202) 237-2727
                                                    Fax: (202) 237-6131
                                                    hhume@bsfllp.com

Of Counsel:                          Samuel C. Kaplan
                                     Kenya K. Davis
                                     BOIES SCHILLER FLEXNER LLP
                                     1401 New York Ave., N.W.
                                     Washington, DC 20005
                                     Tel: (202) 237-2727
                                     Fax: (202) 237-6131
                                     skaplan@bfllp.com
                                     kdavis@bsfllp.com

                                     Eric Zager
                                     KESSLER TOPAZ MELTZER & CHECK LLP
                                     280 King of Prussia Road
                                     Radnor, PA  19087
                                     Tel: (610) 667-7706
                                     Fax: (610) 667-7056
                                     ezager@ ktmc.com

                                     *Interim Co-Lead Class Counsel*